This is not the official court record. Official records of court proceedings may only be obtained directly from the court maintaining a particular record.

## Dacian Master Fund LP v. Josh Wander

| Case Number | 29D03-2406-PL-006763 |
|---|---|
| Court | Hamilton Superior Court 3 |
| Type | PL - Civil Plenary |
| Filed | 06/19/2024 |
| Status | 06/19/2024 , Pending  (active) |

## Parties to the Case

Defendant  Wander, Josh

Address
1300 Monad Terrace
PH B
Miami Beach, FL 33139

Attorney
Justin Owen Sorrell
*#3086649, Retained*

500 N Meridian Street, Suite 550
Indianapolis, IN 46204
317-636-8000(W)

Plaintiff    Dacian Master Fund LP

Attorney
Michael N. Red
*#2506653, Lead, Retained*

Red Law Group LLC
PO Box 7848
Greenwood, IN 46142
317-908-9172(W)

Attorney
Francis J. Earley
*#940495TA, Retained*

919 Third Ave.
38th Fl.
New York, NY 10022
(212) 692-6230(W)

Attorney
John P. Sefick
*#943195TA, Retained*

919 Third Ave.
38th Fl.
New York, NY 10022
(212) 692-6230(W)

## Chronological Case Summary

| 06/19/2024 | **Case Opened as a New Filing** | |
|---|---|---|
| 06/19/2024 | **Appearance Filed** | |
| | Appearance by Attorney | |
| | For Party: | Dacian Master Fund LP |
| | File Stamp: | 06/19/2024 |
| 06/19/2024 | **Complaint/Equivalent Pleading Filed** | |
| | Complaint | |
| | Filed By: | Dacian Master Fund LP |
| | File Stamp: | 06/19/2024 |

**EXHIBIT A**

| | | |
|---|---|---|
| 06/19/2024 | **Subpoena/Summons Filed** | |
| | Summons | |
| | Filed By: | Dacian Master Fund LP |
| | File Stamp: | 06/19/2024 |
| 06/28/2024 | **Motion for Admission Pro Hac Vice** | |
| | Verified Petition for Temporary Admission of Counsel filed. Order submitted. BL | |
| | Filed By: | Dacian Master Fund LP |
| | File Stamp: | 06/27/2024 |
| 06/28/2024 | **Order Granting Motion for Admission Pro Hac Vice** | |
| | Order Granting Verified Petition for Temporary Admission of Counsel entered. BL | |
| | Judicial Officer: | Evans, Christopher J - MAG |
| | Noticed: | Wander, Josh |
| | Noticed: | Red, Michael N. |
| | Order Signed: | 06/28/2024 |
| 06/28/2024 | **Appearance Filed** | |
| | Appearance filed. BL | |
| | For Party: | Dacian Master Fund LP |
| | File Stamp: | 06/28/2024 |
| 06/29/2024 | **Automated ENotice Issued to Parties** | |
| | Order Granting Motion for Admission Pro Hac Vice ---- 6/28/2024 : Michael N. Red | |
| 07/01/2024 | **Clerk Administrative Event** | |
| | Defendant's address added. Copy of Order entered 6/28/24 sent via 1st class mail. ew | |
| 07/17/2024 | **Motion for Admission Pro Hac Vice** | |
| | Verified Petition for Temporary Admission of Counsel filed. Order submitted. BL | |
| | Filed By: | Dacian Master Fund LP |
| | File Stamp: | 07/17/2024 |
| 07/18/2024 | **Order Granting Motion for Admission Pro Hac Vice** | |
| | Order Granting Verified Petition for Temporary Admission of Counsel on Behalf of Plaintiff entered. BL | |
| | Judicial Officer: | Evans, Christopher J - MAG |
| | Noticed: | Wander, Josh |
| | Noticed: | Red, Michael N. |
| | Noticed: | Earley, Francis J. |
| | Noticed: | Sefick, John P. |
| | Order Signed: | 07/17/2024 |
| 07/19/2024 | **Automated Paper Notice Issued to Parties** | |
| | Order Granting Motion for Admission Pro Hac Vice ---- 7/18/2024 : Josh Wander;John P. Sefick | |
| 07/19/2024 | **Automated ENotice Issued to Parties** | |
| | Order Granting Motion for Admission Pro Hac Vice ---- 7/18/2024 : Francis J. Earley;Michael N. Red | |
| 08/12/2024 | **Certificate of Service - separately filed** | |
| | Proof of Service. dc | |
| | Filed By: | Dacian Master Fund LP |
| | File Stamp: | 08/09/2024 |
| 08/13/2024 | **Appearance Filed** | |
| | Appearance for Defendant filed. BL | |
| | For Party: | Wander, Josh |
| | File Stamp: | 08/12/2024 |
| 08/13/2024 | **Motion for Enlargement of Time Filed** | |
| | Initial Motion for Enlargement of Time to Answer Complaint. order sub. dc | |
| | Filed By: | Wander, Josh |
| | File Stamp: | 08/12/2024 |

| 08/13/2024 | **Order Granting Motion for Enlargement of Time** |
|---|---|
| | Order Granting Initial Motion for Enlargement of Time to Answer Complaint entered. BL |

| | Judicial Officer: | Evans, Christopher J - MAG |
|---|---|---|
| | Noticed: | Red, Michael N. |
| | Noticed: | Earley, Francis J. |
| | Noticed: | Sefick, John P. |
| | Noticed: | Sorrell, Justin Owen |
| | Order Signed: | 08/13/2024 |

| 08/14/2024 | **Automated Paper Notice Issued to Parties** |
|---|---|
| | Order Granting Motion for Enlargement of Time ---- 8/13/2024 : John P. Sefick |

| 08/14/2024 | **Automated ENotice Issued to Parties** |
|---|---|
| | Order Granting Motion for Enlargement of Time ---- 8/13/2024 : Francis J. Earley;Justin Owen Sorrell;Michael N. Red |

## Financial Information

\* Financial Balances reflected are current representations of transactions processed by the Clerk's Office. Please note that any balance due does not reflect interest that has accrued – if applicable – since the last payment. For questions/concerns regarding balances shown, please contact the Clerk's Office.

**Dacian Master Fund LP**

Plaintiff

**Balance Due** (as of 09/06/2024)

**0.00**

### Charge Summary

| Description | Amount | Credit | Payment |
|---|---|---|---|
| Court Costs and Filing Fees | 232.00 | 0.00 | 232.00 |

### Transaction Summary

| Date | Description | Amount |
|---|---|---|
| 06/19/2024 | Transaction Assessment | 232.00 |
| 06/19/2024 | Electronic Payment | (232.00) |

| |
|---|
| This is not the official court record. Official records of court proceedings may only be obtained directly from the court maintaining a particular record. |

STATE OF INDIANA ) IN THE HAMILTON SUPERIOR COURT NO. 3
) SS:
COUNTY OF HAMILTON ) CAUSE NO. 29D03-2406-PL-_____

DACIAN MASTER FUND LP, )
)
        Plaintiff, )
)
  v. )
)
JOSH WANDER, )
)
        Defendant. )

## <u>APPEARANCE BY ATTORNEYS IN CIVIL CASE</u>

Party Information: __X__ Initiating ___ Responding ___ Intervening

1. The undersigned attorneys hereby enter their appearances on behalf of:

**<u>Dacian Master Fund LP</u>**

2. Name: <u>Michael N. Red</u>      Atty. No. <u>25066-53</u>
    Firm: <u>Red Law Group LLC</u>      Phone: <u>(317) 908-9172</u>
    Address: <u>P.O. Box 7848</u>
          <u>Greenwood, Indiana 46142</u>
    E-mail: <u>Red@RLGAdvisers.com</u>

3. There are other party members: Yes ☐ No ☒ *(If yes, list on continuation page.)*

4. *If first initiating party filing this case*, the Clerk is requested to assign this case the following Case Type under Administrative Rule 8(b)(3): <u>PL</u>

5. This case involves support issues. Yes ☐ No ☒ *(If yes, supply social security numbers for all family members on continuation page.)*

6. There are related cases: Yes ☐ No ☒ *(If yes, list on continuation page.)*

7. This form has been served on all other parties. Certificate of Service is attached: Yes ☐ No ☒

8. The undersigned attorneys certify that the contact information listed on the Indiana Supreme Court Roll of Attorneys is current and accurate as of the date the appearance is filed;

9.  The undersigned attorneys acknowledge that orders, opinions, and notices, and all documents served under Trial Rule 86(G) will be sent to them at the email addresses on the Roll of Attorneys regardless of other contact information supplied by the attorneys;

10. The undersigned attorneys hereby acknowledge that they are solely responsible for keeping their Roll of Attorneys contact information accurate per Ind. Admis. Disc. R. 2(A)

11. Additional information required by local rule:  <u>None</u>

Respectfully submitted,

*/s/ Michael N. Red*
Michael N. Red

*Attorney's information shown above*

Case 1:24-cv-01549-JPH-KMB    29D03-2406-PL-006763    09/10/24    Page 6 of 133 PageID Filed: 4/19/2024 1:23 PM
#: 12
Hamilton Superior Court 3

Clerk
Hamilton County, Indiana

STATE OF INDIANA      )     IN THE HAMILTON SUPERIOR COURT NO. 3
                 ) SS:
COUNTY OF HAMILTON   )    CAUSE NO. 29D03-2406-PL-_____

DACIAN MASTER FUND LP,     )
                     )
         Plaintiff,     )
                     )
    v.               )
                     )
JOSH WANDER,         )
                     )
        Defendant.    )

## COMPLAINT

Plaintiff Dacian Master Fund LP ("Plaintiff"), by and through its attorneys, as and for its complaint against Josh Wander ("Defendant"), alleges as follows:

## INTRODUCTION

1.  This case involves a straightforward personal guaranty by Defendant of a loan issued by an Insurance Company (the "Company"), which the Company subsequently assigned to Plaintiff. In exchange for the Company's extending $50 million in loans to Noble Financial Solutions, LLC ("Noble") to be used to invest in senior debt, with the proceeds of that investment being used to purchase preferred equity in the company where Defendant served as Managing Partner, Defendant agreed to personally guarantee $25 million of those loans. He agreed to pay that amount, with any applicable interest, in the event that Noble defaulted on its payment obligations. Notably, he agreed that the Company – and by assignment, Plaintiff – would not need to go to Noble first to collect before seeking to recover it from him. Noble defaulted by failing to make interest payments in accordance with the agreement governing the loans. As such, by the express terms of the guaranty Defendant executed, as explained below, he is now liable to Plaintiff, as assignee of the loan, for $25 million of the remaining balance on the loan (which far exceeds the $25 million he

1

guaranteed) along with post-judgment interest and costs, including attorneys' fees, associated with Plaintiff pursuing this amount.

## THE PARTIES

1.  Dacian Master Fund LP is a Delaware Limited Partnership.

2.  Upon information and belief, at all times relevant to this action, Josh Wander was the Managing Partner of 777 Partners, LLC, and a resident of Florida.

## JURISDICTION AND VENUE

3.  Venue is proper in this county, as evidenced by the express agreement in the Guaranty (as defined herein and as attached hereto as Exhibit A), which provides, among other things, that (1) state courts located in Hamilton County, Indiana, have jurisdiction over any and all actions involving the Guaranty and any agreement made in connection with it; (2) Defendant irrevocably and unconditionally agreed to submit to the jurisdiction of this court; and (3) Defendant irrevocably and unconditionally waived any objection that he may have had to this court being the proper venue for any action or proceeding arising under the Guaranty.  *See* Exhibit A at 5.

## GENERAL ALLEGATIONS

4.  In September 2021, the Company agreed in principle to extend two $25 million loans to Noble, subject to certain conditions being satisfied.

### The Loan and Security Agreement

5.  This agreement was reflected in a Loan and Security Agreement ("Loan Agreement"), dated September 20, 2021, between Noble as "Borrower", 777 Asset Management LLC as "Security Agent", and certain "Lenders," which included the Company and Haymarket Insurance Company ("Haymarket") (the Loan Agreement is attached hereto as Exhibit B).

2

6.   Under the terms of the Loan Agreement, the Lenders agreed to loan to Noble an amount totaling $70 million.  The lenders were the Company, which agreed to extend a $50 million loan, and Haymarket, which agreed to extend a $20 million loan.  The Company's $50 million loan came from two separate accounts, as reflected in Schedule A to the Loan Agreement: $25 million from its general account and $25 million from its Modco Account.  This arrangement was further outlined in a Side Letter between Noble and the Company, discussed *infra*.

7.   Pursuant to the Loan Agreement, Noble agreed to pay all unpaid interest accrued on the loans on a quarterly basis, with payment due on the final business day of each calendar quarter, and all amounts outstanding under the loans on September 30, 2031.  Ex. B at §§ 1.04(a); 1.01 at 7.

8.   The Loan Agreement provided that Noble's failure to pay interest on the loans at the required time would constitute an "Event of Default."  The Loan Agreement specifically provides that "Event of Default" includes "any default in the payment of any sums due hereunder after the date when the same shall become due or payable, whether at the due date thereof or at a date fixed by acceleration or otherwise[.]" *Id.* § 6.01(b).

9.   In an Event of Default based on the failure to pay interest on the loans, the Company, upon written notice to Noble, had the right to demand that Noble immediately pay the entire principal amount of the Loan, with interest:

> If any Event of Default other than pursuant to Section 6.01(d) or (e) shall occur and be continuing, [the Company], upon written notice to [Noble], may declare the outstanding principal amount of an interest on the Loan and all other amounts due and owing . . . to be due and payable without other notice to [Noble] . . . whereupon the full unpaid amount of the Loan and any and all other Obligations, which shall be so declared due and payable shall bear interest at the Default Rate and shall be and become immediately due and payable.

*Id.* § 6.02.

*The Side Letter*

10. The contemplated loans also were outlined in a September 17, 2021 letter from the Company to Defendant (the "Side Letter," attached hereto as Exhibit C), which was executed in connection with an existing Investment Management Agreement between the Company and 777 Asset Management LLC, dated June 30, 2021 (the "Investment Management Agreement") and a Reinsurance Agreement between the Company and 777 Re Ltd., effective June 30, 2021.

11. The loans were executed in connection with existing agreements, and the Side Letter was sent to the following people, who were representatives from the companies that were counterparties to these agreements and/or who undertook obligations in connection with loans: (1) Defendant, who agreed and accepted the Side Letter's terms on his own behalf and on behalf of 777 Partners, LLC; (2) Paul Stanworth, who agreed and accepted the Side Letter's terms on behalf of 777 Asset Management LLC; and (3) and Will Rinehimer, who agreed and accepted the Side Letter's terms on behalf of 777 Re Ltd.

12. The Side Letter, among other things, outlined the purpose of the two $25 million loans and described various conditions that had to be satisfied before the Company would agree to extend these loans to Noble.

13. In this regard, the Side Letter explained that 777 Asset Management LLC requested permission from the Company to invest assets, which 777 Asset Management LLC currently managed, in senior debt issued by Noble (the "Noble Senior Debt"), with the proceeds from the investment being used to purchase $100 million of preferred equity in 777 Partners LLC, the company where Defendant served as a Managing Partner.

14. According to the Side Letter, the Company agreed to allow 777 Asset Management to invest $25 million in the Noble Senior Debt using assets held in a designated account ("Modco").

4

15. The Side Letter also confirmed that the Company agreed to make a <u>separate</u> investment of $25 million in the Noble Senior Debt using its own assets, not connected to Modco (the "Company Investment").

16. The two separate accounts identified in the Side Letter from which the Company would loan a total of $50 million is reflected in Schedule A of the Loan Agreement.

17. The Side Letter further provided that the Company would make the loans from the Modco account and the Company Investment subject to various conditions being satisfied. For example, the Side Letter provided that, among other things, Defendant would execute an unconditional personal guaranty to guarantee payment of the Company Investment in the event Noble was unable to pay. As part of this guaranty, the Company would have immediate recourse against Defendant for any amount that became due and unpaid and would not be obligated to first seek recovery from Noble.

18. Defendant executed the Side Letter on or about September 17, 2021.

***The Guaranty***

19. As agreed in the Side Letter, on September 20, 2021, Defendant executed a guaranty for the Company's benefit (the "Guaranty"). The Guaranty provides that Defendant unconditionally guarantees the full and prompt payment of any amounts due to the Company from Noble in connection with the Company Investment – *i.e.*, Defendant unconditionally guarantees to the Company that if Noble fails to pay the Company any portion of the Company Investment or interest due on it, Defendant is responsible for paying the entire amount due and owing on the Company Investment (or to any assignees of the Company Investment). In this regard, the Guaranty provides as follows:

a. "JOSH WANDER ("**Guarantor**") hereby unconditionally guarantees the full and prompt payment when due of the Guaranty Obligations (as defined herein), together with all costs, attorneys' fees and expenses paid or incurred by [the Company] in endeavoring to collect the Guaranty Obligations, including without limitation in the enforcement of this Guaranty."  Ex. A at 1.

b. "'**Guaranty Obligations**' means, "collectively: (1) all obligations, liabilities and indebtedness of [Noble] to [the Company], now existing or hereafter arising, including the obligations evidenced by the Note, together with all interest accruing thereon, and all fees, charges and other amounts payable thereunder, whether such indebtedness, obligations and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several or joint and several; and (2) all extensions, renewals, amendments, restatements or replacements of the foregoing, together with all costs, expenses and reasonable attorneys' fees paid or incurred by [the Company] in the enforcement or collection of any of the foregoing or this Guaranty."  *Id.* at 4.

c. "**Note**" was defined to mean "that certain Promissory Note, dated [September 20, 2021], executed by [Noble] in favor of [the Company], in the original principal amount of $25,000,000, as the same may hereafter be amended, modified and/or restated from time to time and at any time."[1]  *Id.*

20. The Guaranty further provides that if Noble defaults on payment of any portion of the Guaranty Obligations, which includes the obligations Noble owed to the Company pursuant to the Loan Agreement and Note, Defendant is responsible for paying the remaining balance of those Guaranty Obligations:

> [Defendant] absolutely and unconditionally covenants and agrees that in the event [Noble] defaults in payment of the Guaranty Obligations, or any part thereof, for any reason, when such becomes

---

[1] The Promissory Note referenced in the definition of "Note" and described as being executed in connection with this Guaranty on September 20, 2021 ultimately documented three separate loans, for $70 million collectively (the "Promissory Note," attached hereto as Exhibit D; *see supra* ¶ 6). Specifically, it documented the $25 million Company Investment, the $25 million for the loan from the Modco account, and a separate $20 million loan from Haymarket.  The Promissory Note incorporates by reference the definitions and terms included in the Loan Agreement, as defined in paragraph 5, *supra*, including the composition of the Promissory Note, which is summarized in Schedule A to the Loan Agreement.

due, either by its terms or as a result of the exercise of any power to accelerate, [Defendant] . . . shall pay the Guaranty Obligations.

Ex. A at 2.

21. In terms of timing, the Guaranty provides that the Company is entitled to demand from Defendant the full amount due and owing on the Guaranty Obligations immediately:

> [T]he undersigned, JOSH WANDER ("**Guarantor**"), hereby unconditionally guarantees the full and prompt payment *when due* of the Guaranty Obligations . . .

> [The Company], without authorization from or notice to [Defendant] and without impairing or affecting the liability of [Defendant] hereunder, may from time to time at its reasonable discretion and with or without valuable consideration, alter, compromise, **accelerate**, extend or change the time or manner for the payment of any or all of the Guaranty Obligations owed to it . . . .

> [Defendant] absolutely and unconditionally covenants and agrees that in the event [Noble] defaults in payment of the Guaranty Obligations, or any part thereof, for any reason, when such becomes due, either by its terms or as the result of the exercise of any power to accelerate, **[Defendant] on demand and without further notice of dishonor and without any notice with respect to any matter or occurrence having been given to [Defendant] previous to such demand, shall pay the Guaranty Obligations**.

*Id.* at 1-2 (emphasis added).

22. To the extent any part of the Company Investment was assigned to another party, Defendant also agreed to guaranty that assigned amount, with the Guaranty providing as follows: "[t]his Guaranty shall bind Guarantor and Guarantor's successors, assigns and legal representatives, and **shall inure to the benefit of all transferees, credit participants, assignees, successors, and endorsees of Lender**." *Id.* at 4 (emphasis added).[2]

---

[2] On or about September 12, 2022, $5 million of the $25 million Company Investment was assigned to the Modco account, resulting in the Company Investment's principal loan being reduced from $25 million to $20 million and the Modco's principal amount being increased from $20 million to $25 million (Modco previously assigned $5

23. Finally, the Guaranty provides that the Company is not required to pursue any remedies before invoking the benefits of the Guaranty.  In other words, the Company is not required to exhaust its remedies against Noble (or even pursue an action against Noble) before requiring Defendant to pay the amounts due under the Guaranty.  Rather, the Company is entitled to seek enforcement of the Guaranty as soon as a default by Noble occurs, without regard to taking any action against Noble.  In this regard, the Guaranty provides:

> [The Company] shall not be required to pursue any other remedies before invoking the benefits of the guaranty of payment contained herein, and specifically it shall not be required to exhaust its remedies against [Noble] or any surety or guarantor other than [Defendant] or to proceed against any security now or hereafter existing for the payment of any of the Guaranty Obligations.  [The Company] may maintain an action on this Guaranty, whether or not [Noble] is joined therein or separate action is brought against [Noble].

*Id.* at 2.

### Noble's Default Under the Loan and Security Agreement

24. On January 20, 2023, the Company sent Noble a letter regarding Noble's failure to make a quarterly payment to the Company as required by the Loan Agreement (the "January 2023 Default Letter," attached hereto as Exhibit E).   In this letter, the Company informed Noble of its default for failure to make the quarterly payment as required by the Loan Agreement:

> This letter shall serve as notice to Noble . . . that the [Loan Agreement], **is in default** due to the failure to make the quarterly payment of $1,453,033.29 (the 'Payment Amount') that was due to [the Company] on December 30, 2022 (the 'Date of Default').  In accordance with the [Loan Agreement], the applicable interest rate has increased to 12.857143% as of the Date of Default (the 'Default

---

million of the loan to Haymarket, making the balance of the loan by Modco $20 million).  Thus, prior to the assignment to plaintiff, discussed *infra* at ¶ 28, Noble owed $45 million in principal collectively on the loans from Modco and the Company Investment.  The right to this $45 million was assigned to plaintiff in June 2024, effective January 1, 2024.  *See infra* at ¶ 28.

> Interest'). Please immediately remit payment to [the Company] of the Payment Amount plus the Default Interest from the Date of Default.

Ex. E. While Noble made payments to the Company thereafter in the months that followed, it did not fully cover the outstanding amounts due to the Company and remained in default.

25. On June 30, 2023, Noble was due to make an interest payment to the Company. It once again failed to make this payment. Thus, on July 19, 2023, the Company sent Noble, copying Defendant, a letter regarding Noble's failure to make another quarterly payment to the Company as required by the Loan Agreement (the "July 19, 2023 Default Letter," attached hereto as Exhibit F). In this letter, the Company informed Noble of its default for failing again to make a quarterly payment as required by the Loan Agreement:

> Please be advised that the debt issued by [Noble] to [the Company] . . . is currently in default with total accrued and default interest in the amount of Six Hundred Thirty-Five Thousand Six Hundred Sixteen Dollars and Forty-Five Cents ($635,616.45) due and owing [the Company]. . . . . Further, in connection with the [Side Letter], Josh Wander entered into an unconditional personal guaranty that guarantees the payment of the Noble Senior Debt. . .. If this situation is not remedied, [the Company] is prepared to take legal action against . . . Mr. Wander personally to secure performance of the obligations undertaken by [him].

Ex. F. After this letter was sent, Noble not only failed to cure its failure to pay the Company as required by the Loan Agreement, but it missed quarterly payments in September and December 2023, along with the default interest that continued to accrue.

26. As of June 19, 2024, Noble has not paid down any of the principal of either of the loans that the Company made. Moreover, it has failed to pay accrued interest to the Company as required under the Loan Agreement, as well as the default interest that has accrued due to its failure to remit quarterly payments and cure its failure to pay. According to 777 Asset Management's own

calculations, just for the period from April 2023 to September 2023, Noble had accrued at least $787,866.94 in unpaid interest on the principal of the Company Investment loan and an additional $252,054.79 in default interest for failing to pay in that period. Moreover, its records show that through early January 2024, nearly $1.3 million in unpaid interest (not including default interest) had accrued on the principal amount due under the Company Investment.[3]

27. Noble's failure to pay the interest due to the Company constitutes an Event of Default under Section 6.01(b) of the Loan and Security Agreement.

***Assignment to Plaintiff***

28. On June 4, 2024, the Company executed two Assignment and Acceptance agreements (the "Assignment Agreements," attached hereto as Exhibits G and H), assigning the Company's rights and obligations under the Loan Agreement to Plaintiff, effective January 1, 2024. These Assignment Agreements reflect the $45 million in principal outstanding pursuant to the Loan Agreement that the Company executed with Noble and assigned to Plaintiff the rights the Company had in the Loan Agreement and Note, "including without limitation any guarantees, security or collateral issued pursuant thereto." Ex. G at ¶ 1; Ex. H at ¶ 1. Further, the Assignment Agreements assigned to Plaintiff all "claims, suits, causes of action, and any other rights" the Company had in its capacity as Lender under the Loan Agreement. Ex. G at ¶ 1; Ex. H at ¶ 1.

29. Because Noble continues to be in default under the Loan Agreement, and Defendant unconditionally guaranteed to be responsible for paying any principal or interest due in connection with any default under the Loan Agreement, including to any assignee of the Company, Defendant

---

[3] Notably, 777 Asset Management's calculations were made on a loan with $20 million in par value, meaning the unpaid accrued interest did not even take into account the remaining $5 million of loan principal assigned to Modco.

is liable to pay the balance of the Guaranty Obligations to Plaintiff, as assignee, along with any costs associated with pursuing it.

<u>**COUNT I**</u>
<u>**BREACH OF GUARANTY**</u>

30. Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 29 above as if fully set forth herein.

31. On or about September 20, 2021, Defendant executed the Guaranty for the benefit of the Company or any of its assignees. *See* Ex. A.

32. At all relevant times, the Guaranty constituted a valid, enforceable agreement between Defendant and the Company.

33. Under the terms of the Guaranty, Defendant unconditionally guaranteed the full and prompt payment of the Guaranty Obligations. The term "Guaranty Obligations" was defined to include any amounts due in connection with the Loan Agreement and Note, which provided the terms regarding the Company's two separate $25 million loans to Noble, including the Company Investment. *See* Ex. A.

34. Pursuant to the express terms of the Guaranty, in the event Noble failed to pay all or any part of the Guaranty Obligations, Defendant unconditionally agreed to immediately pay to the Company, or its assignees, any outstanding amount of the Guaranty Obligations, together with all costs, attorneys' fees and expenses paid or incurred by the Company in endeavoring to collect the Guaranty Obligations, including without limitation in the enforcement of the Guaranty.

35. At all relevant times, the Company performed all obligations required of it under the Guaranty.

36. Noble defaulted under the Loan Agreement by failing to pay interest on the loans on a quarterly basis.  Upon Noble's default, Defendant became obligated to pay the Guaranty Obligations.

37. While Plaintiff, as assignee, is under no obligation to pursue the Guaranty Obligations from Noble, on or about January 20, 2023, and again on July 19, 2023, the Company nevertheless informed Noble and Defendant of Noble's default on the Loan Agreement due to its failure to pay quarterly interest.  To date, Noble has not cured its failure to pay interest – either the amount accrued on the principal amount or the accrued default interest.

38. Defendant has not paid the Company or Plaintiff the Guaranty Obligations following Noble's default and the Company's July 19, 2023 letter regarding that default and request that it be cured.  As such, Defendant has breached his obligations under the Guaranty.

39. After the Company sent the July 19, 2023 letter, Noble continued to fail to make the required interest payments under the Loan Agreement.  Defendant, too, failed to make payments. As such, his breach of the Guaranty continued.

40. As an actual, direct and proximate result of Defendant's breach of the Guaranty, the Company was damaged and entitled to recover under the terms of the Guaranty.  The Company assigned its rights to Plaintiff, and as such, Plaintiff has been damaged and is entitled to recover an amount not less than $25 million, the amount that Defendant agreed to guarantee under the Guaranty, as well as post-judgment interest at the applicable legal rate, and attorneys' fees, costs, and expenses incurred by Plaintiff in seeking to collect the Guaranty Obligations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant in the principal amount of $25 million, the amount that Defendant agreed to guarantee

under the Guaranty, as well as post-judgment interest at the applicable legal rate, and attorneys'

fees, costs, and expenses incurred by the Company in seeking to collect the Guaranty Obligations.

Respectfully submitted,

RED LAW GROUP LLC

*/Michael N. Red*
Michael N. Red
Attorney No. 25066-53
RED LAW GROUP LLC
P.O. Box 7848
Greenwood, IN  46142
Phone: (317) 908-9172
Email: Red@rlgadvisers.com

13

# EXHIBIT A

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

## GUARANTY

September 20, 2021

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, and in consideration of credit given, being given and to be given, and of other financial accommodations afforded or to be afforded by SILAC INSURANCE COMPANY, a Utah-domiciled life insurance company ("**Lender**"), to NOBLE FINANCIAL SOLUTIONS, LLC, a Delaware limited liability company ("**Debtor**"), the undersigned, JOSH WANDER ("**Guarantor**"), hereby unconditionally guarantees the full and prompt payment when due of the Guaranty Obligations (as defined herein), together with all costs, attorneys' fees and expenses paid or incurred by Lender in endeavoring to collect the Guaranty Obligations, including without limitation in the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional guaranty of the payment of the Guaranty Obligations, and shall continue and be in full force and effect until all of the Guaranty Obligations shall be fully paid and no further Guaranty Obligations may thereafter arise. Certain other Persons may guarantee payment of all or part of the Guaranty Obligations (such Persons being referred to herein collectively as the "**Other Guarantors**"). Guarantor acknowledges and agrees that Guarantor's liability with respect to the Guaranty Obligations shall not be diminished, discharged, released or otherwise affected in any way in the event any of the Other Guarantors fails to execute a guaranty of all or any part of the Guaranty Obligations, fails to be bound thereby, fails to perform thereunder or in the event that such guaranty shall be invalid or unenforceable in whole or in part for any reason.

Guarantor expressly waives presentment for payment, demand, notice of demand and of dishonor and nonpayment of the Guaranty Obligations, protest and notice of protest, diligence in collecting and in the bringing of suit against any other Person, and Lender shall be under no obligation to notify Guarantor of its acceptance of this Guaranty or of any advances made or credit extended on the faith hereof or the failure of Debtor to pay any of the Guaranty Obligations as they mature, or to use diligence in preserving the liability of any Person (including, without limitation, Debtor) on the Guaranty Obligations or in bringing suit to enforce collection of the Guaranty Obligations. To the full extent allowed by applicable law, Guarantor waives all defenses given to sureties or guarantors at law or in equity other than the actual payment of the Guaranty Obligations and waives, to the full extent allowed by applicable law, all defenses based upon questions as to the validity, legality or enforceability of the Guaranty Obligations.

Lender, without authorization from or notice to Guarantor and without impairing or affecting the liability of Guarantor hereunder, may from time to time at its reasonable discretion and with or without valuable consideration, alter, compromise, accelerate, extend or change the time or manner for the payment of any or all of the Guaranty Obligations owed to it, extend additional loans, credit and financial accommodations and otherwise create additional Guaranty Obligations, increase or reduce the rate of interest thereon, take and surrender security, exchange collateral by way of substitution, or in any way it deems necessary take, accept, withdraw, subordinate, alter, amend, modify or eliminate collateral, add or release or discharge endorsers, guarantors or other obligors (including, without limitation, Debtor) make changes of any sort whatever in the terms of payment of the Guaranty Obligations owed to it or of doing business with Debtor, settle or compromise with Debtor or any other Person or Persons liable on the Guaranty Obligations owed to it (including, without limitation, Debtor) and direct the order or manner of sale of any security or collateral, all on such terms at it may see fit, and may apply all moneys received from Debtor or others, or from any security or collateral held by it (whether held under a security instrument or not) in such manner upon the Guaranty Obligations owed to it (whether then due or not) as it may determine to be in its best interest, without in any way being required to marshal securities or assets or to apply all or any part of such moneys upon any particular part of the Guaranty Obligations. It is specifically agreed that Lender is not required to retain, hold, protect, exercise due care with respect

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

thereto, or perfect security interests in or otherwise assure or safeguard any collateral or security for the Guaranty Obligations.  No exercise or nonexercise by Lender of any right or remedy of Lender shall in any way affect any of Guarantor's obligations hereunder or any security furnished by Guarantor or give Guarantor any recourse against Lender.

The liability of Guarantor hereunder shall continue notwithstanding the incapacity, death, disability, dissolution or termination of any other Person or Persons (including, without limitation, Debtor).  Neither (i) the failure of Lender to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of Debtor or of any other Person, (ii) the disallowance or avoidance under the Federal Bankruptcy Code (11 U.S.C. § 101 et seq., as amended) (the "**Bankruptcy Code**") of all or any portion of Lender's claims for repayment of the Guaranty Obligations or any security for the Guaranty Obligations, (iii) the use of cash or non-cash collateral under Section 363 of the Bankruptcy Code or any financing, extension of credit by Lender or grant of security interest to Lender under Section 364 of the Bankruptcy Code, nor (iv) any election of Lender in a proceeding instituted under the Bankruptcy Code, including without limitation any election of the application of Section 1111(b)(2) of the Bankruptcy Code, shall affect the liability of Guarantor hereunder; nor shall Guarantor be released from liability if recovery from Debtor or any other Person becomes barred by any statute of limitations or is otherwise restricted or prevented.

Lender shall not be required to pursue any other remedies before invoking the benefits of the guaranty of payment contained herein, and specifically it shall not be required to exhaust its remedies against Debtor or any surety or guarantor other than Guarantor or to proceed against any security now or hereafter existing for the payment of any of the Guaranty Obligations.  Lender may maintain an action on this Guaranty, whether or not Debtor is joined therein or separate action is brought against Debtor.

Guarantor absolutely and unconditionally covenants and agrees that in the event Debtor defaults in payment of the Guaranty Obligations, or any part thereof, for any reason, when such becomes due, either by its terms or as the result of the exercise of any power to accelerate, Guarantor on demand and without further notice of dishonor and without any notice with respect to any matter or occurrence having been given to Guarantor previous to such demand, shall pay the Guaranty Obligations.

Guarantor further agrees that to the extent Debtor, Guarantor or any other Person makes a payment or transfers an interest in any property to Lender or the Lender enforces any security interest or lien or exercises any rights of set-off, and such payment or transfer or proceeds of such enforcement or set-off, or any portion thereof, are subsequently invalidated, declared to be fraudulent or preferential, or otherwise is avoided, and/or required to be repaid to Debtor, Debtor's estate, a trustee, receiver or any other Person under the Bankruptcy Code or any other bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such avoidance or repayment, the Guaranty Obligations or part thereof intended to be satisfied shall be revived and this Guaranty shall continue to be effective or shall be reinstated, as the case may be, and continued in full force and effect as if said payment or transfer had not been made or such enforcement or set-off had not occurred.

The payment by Guarantor of any amount pursuant to this Guaranty shall not in any way entitle Guarantor to any right, title or interest (whether by way of subrogation or otherwise) in and to any of the Guaranty Obligations or any proceeds thereof, or any security therefor.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS GUARANTY OR THE NOTE, SO LONG AS THE GUARANTY OBLIGATIONS ARE OUTSTANDING, GUARANTOR HEREBY UNCONDITIONALLY AGREES NOT TO ASSERT: (1) ANY CLAIM OR OTHER RIGHT, NOW EXISTING OR HEREAFTER ARISING, AGAINST DEBTOR OR ANY OTHER PERSON PRIMARILY OR CONTINGENTLY LIABLE FOR ALL OR ANY PART OF THE GUARANTY OBLIGATIONS, WHICH ARISES FROM OR BY VIRTUE OF THE EXISTENCE OR

2

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

PERFORMANCE OF THIS GUARANTY, INCLUDING, WITHOUT LIMITATION: (A) ANY RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR OTHER RIGHT TO PAYMENT, WHETHER OR NOT SUCH RIGHT IS REDUCED TO JUDGMENT, LIQUIDATED, UNLIQUIDATED, FIXED, CONTINGENT, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED; OR (B) ANY RIGHT TO AN EQUITABLE REMEDY FOR BREACH OF PERFORMANCE IF SUCH BREACH GIVES RISE TO A RIGHT TO PAYMENT, WHETHER OR NOT SUCH RIGHT TO AN EQUITABLE REMEDY IS REDUCED TO A JUDGMENT, FIXED, CONTINGENT, MATURED, UNMATURED, DISPUTED, UNDISPUTED, SECURED OR UNSECURED; AND (2) ANY RIGHT TO PARTICIPATE OR SHARE IN ANY RIGHT, REMEDY OR CLAIM OF LENDER AGAINST ANY OF DEBTOR'S INCOME OR ASSETS OR WITH RESPECT TO ANY COLLATERAL OR OTHER SECURITY FOR ALL OR ANY PART OF THE GUARANTY OBLIGATIONS OR ANY OTHER RIGHT OR CLAIM OF LENDER OF RECOURSE TO AND WITH RESPECT TO ANY ASSETS, INCOME OR PROPERTIES OF DEBTOR.

Guarantor represents and warrants to Lender that (i) Guarantor has a direct or indirect financial interest in Debtor and will benefit directly from the extension by Lender to Debtor of the loan facilities described in the Note; (ii) Guarantor is Solvent (as hereinafter defined); (iii) the execution and delivery of this Guaranty by Guarantor was not undertaken by Guarantor with the "intent to hinder, delay, or defraud" (within the meaning of Ind. Code § 32-18-2-14 and §548(a)(1) of the Bankruptcy Code) creditors or any other Persons; (iv) that neither this Guaranty nor the payment or performance by Guarantor of Guarantor's obligations arising under or pursuant to this Guaranty do or are intended to render Guarantor insolvent, undercapitalized or in a condition of financial stringency; (v) this Guaranty is a legal, valid and binding obligation of Guarantor, enforceable in accordance with its terms; and (vi) the execution of this Guaranty by Guarantor and Guarantor's performance of all of its obligations hereunder have been duly authorized by all necessary organizational action. If at any time any portion of the obligations of Guarantor under this Guaranty shall be determined by a court of competent jurisdiction to be invalid, unenforceable or avoidable, the remaining portion of the Guaranty Obligations under this Guaranty shall not in any way be affected, impaired, prejudiced or disturbed thereby and shall remain valid and enforceable to the full extent permitted by applicable law. Notwithstanding anything in this Guaranty to the contrary, the liability of Guarantor hereunder shall be limited to the maximum amount which would not result in any one of the following conditions:

      a.    this Guaranty would constitute a fraudulent transfer within the meaning of § 548(a) of the Bankruptcy Code;

      b.    this Guaranty would constitute a fraudulent transfer within the meaning of Ind. Code § 32-18-2-1, et seq.; or

      c.    this Guaranty would constitute a fraudulent conveyance or fraudulent transfer within the meaning of any other applicable Federal or state bankruptcy, insolvency or other similar law or judicial decision.

All principal of and interest on any and all indebtedness, liabilities and obligations of Debtor to Guarantor (the "**Subordinated Debt**"), whether direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, now existing or hereafter arising, due or to become due to Guarantor, or held or to be held by Guarantor, whether created directly or acquired by assignment or otherwise, and whether evidenced by a written instrument or not, shall be expressly subordinated to the Guaranty Obligations. Guarantor agrees not to receive or accept any payment of the Subordinated Debt and, in the event Guarantor receives any payment on the Subordinated Debt in violation of the foregoing,

US.134619708.02

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

Guarantor will hold any such payment in trust for Lender and forthwith turn it over to Lender, in the form received, to be applied to the Guaranty Obligations.

The rights of Lender are cumulative and shall not be exhausted by its exercise of any of its rights under this Guaranty or otherwise against Guarantor or by any number of successive actions until and unless each and all of the obligations of Guarantor under this Guaranty have been fully performed, satisfied and discharged.

Capitalized terms used herein but not defined shall have the meaning assigned thereto in the Note. Additionally, when used in this Guaranty:

(a)    "**Guaranty**" means this Guaranty, as the same may be amended and/or restated from time to time and at any time.

(b)    "**Guaranty Obligations**" means, collectively: (1) all obligations, liabilities and indebtedness of Debtor to Lender, now existing or hereafter arising, including the obligations evidenced by the Note, together with all interest accruing thereon, and all fees, charges and other amounts payable thereunder, whether such indebtedness, obligations and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several or joint and several; and (2) all extensions, renewals, amendments, restatements or replacements of the foregoing, together with all costs, expenses and reasonable attorneys' fees paid or incurred by Lender in the enforcement or collection of any of the foregoing or this Guaranty.

(c)    "**Note**" means that certain Promissory Note, dated as of even date herewith, executed by Debtor in favor of Lender, in the original principal amount of $25,000,000, as the same may hereafter be amended, modified and/or restated from time to time and at any time.

(d)    "**Person**" means an individual, a corporation, a limited or general partnership, a limited liability company, a joint venture, a trust or unincorporated organization, a joint stock company or other similar organization, or any other legal entity, whether acting in an individual, fiduciary or other capacity.

(e)    "**Solvent**" means with respect to any Person, that (i) the fair value of the assets of such Person at a fair valuation, will exceed the debts and liabilities, subordinated, contingent or otherwise, of such Person; (ii) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of such Person on such Person's debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) such Person will be able to pay such his/her/its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) such Person will have sufficient capital with which to conduct the businesses in which such Person is engaged as such businesses are now conducted and are proposed to be conducted after the date hereof.

This Guaranty shall be deemed to have been made under and shall be governed by the laws of the State of Indiana in all respects and shall not be waived, altered, modified or amended as to any of its terms or provisions except in writing duly signed by Lender and Guarantor. This Guaranty shall bind Guarantor and Guarantor's successors, assigns and legal representatives, and shall inure to the benefit of all transferees, credit participants, assignees, successors and endorsees of Lender. The failure of any Person to execute or be bound by this Guaranty shall not release or affect the liability of Guarantor, and the liability of Guarantor under this Guaranty is not conditioned or contingent upon or subject in any way

4

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

to obtaining or retaining the primary or secondary liability of any other Person with respect to all or any part of the Guaranty Obligations (including, without limitation, Debtor and the Other Guarantors).

Any notice given under or with respect to this Guaranty to Guarantor or Lender shall be in writing and, if delivered by hand or sent by overnight courier service, shall be deemed to have been given when delivered and, if mailed, shall be deemed to have been given five (5) days after the date when sent by registered or certified mail, postage prepaid, and, if to Guarantor addressed to Guarantor at the address of the Guarantor set forth on the signature page to this Guaranty, or, if to Lender, at Lender's address for notices set forth in the Note, or at such other address as either of Guarantor or Lender may, by written notice to the other, have designated as its address for such purpose.

Lender is relying and is entitled to rely upon each and all of the provisions of this Guaranty; and accordingly, if any provision or provisions of this Guaranty should be held to be invalid or ineffective, then all other provisions shall continue in full force and effect.

**GUARANTOR AND LENDER (BY ITS ACCEPTANCE OF THIS GUARANTY) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG GUARANTOR AND LENDER ARISING IN ANY WAY OUT OF OR WHICH IN ANY WAY INVOLVES ANY OF THE RIGHTS, OBLIGATIONS OR REMEDIES OF ANY PARTY TO THIS GUARANTY OR ANY DOCUMENT EXECUTED OR DELIVERED PURSUANT TO OR OTHERWISE IN CONNECTION WITH THIS GUARANTY OR THE NOTE, OR ANY RELATIONSHIP BETWEEN GUARANTOR AND LENDER. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED IN THE NOTE. NEITHER GUARANTOR NOR LENDER WILL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN OR CANNOT BE WAIVED.**

**GUARANTOR AGREES THAT THE STATE AND FEDERAL COURTS LOCATED IN, OR WITH JURISDICTION WHICH INCLUDES HAMILTON COUNTY, INDIANA, HAVE NON-EXCLUSIVE JURISDICTION OVER ANY AND ALL ACTIONS AND PROCEEDINGS INVOLVING THIS GUARANTY OR ANY OTHER AGREEMENT MADE IN CONNECTION HEREWITH AND GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES TO SUBMIT TO THE JURISDICTION OF SUCH COURTS FOR PURPOSES OF ANY SUCH ACTION OR PROCEEDING. GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT GUARANTOR MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING, INCLUDING ANY CLAIM THAT SUCH COURT IS AN INCONVENIENT FORUM, AND CONSENTS TO SERVICE OF PROCESS PROVIDED THE SAME IS IN ACCORDANCE WITH THE TERMS HEREOF. FINAL JUDGMENT IN ANY SUCH PROCEEDING AFTER ALL APPEALS HAVE BEEN EXHAUSTED OR WAIVED SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT. NOTHING IN THIS GUARANTY SHALL AFFECT ANY RIGHT THAT LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTY AGAINST GUARANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.**

*[Signature page follows]*

US.134619708.02

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

Executed and delivered to Lender effective as of the date first set forth above.

DocuSigned by:

FC768EC395214A8...

Josh Wander

Address of Notices:

_____

_____

# EXHIBIT B

EXECUTION VERSION

# LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** dated as of September 20, 2021 (as the same may be amended, supplemented or otherwise modified from time to time, the "Agreement") is entered into by and among **NOBLE FINANCIAL SOLUTIONS LLC**, a Delaware limited liability company (the "Borrower"), the Security Agent (as defined herein) and the lenders party hereto from time to time (collectively, the "Lenders").

WHEREAS, the Lenders have agreed to extend a loan in the amount of Seventy Million Dollars ($70,000,000) (the "Loan") to the Borrower for the purpose of making a One Hundred Million Dollar ($100,000,000) preferred equity investment in 777 Partners LLC, with the allocation of the Loan among the lenders party hereto as described on **Schedule A**; and

WHEREAS, the Borrower is willing to grant to the Lenders a lien on and security interest in the Collateral to secure the Loan and other financial accommodations being granted by the Lenders to the Borrower.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Borrower and the Lenders hereby agree as follows:

## I.  GENERAL TERMS

**1.01.  Definitions.**  Capitalized terms used in this Agreement and not defined elsewhere have the meanings set forth below:

"Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Affiliate" shall mean, respect to a specified Person, (a) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, and (b) any officer or director of such Person.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have correlative meanings. For purposes of this definition, a Person shall be deemed to Control another Person if the Controlling Person owns or controls directly or indirectly fifty percent (50%) or more of the shares of stock, other Equity Interests or Equity Interests Equivalents or voting powers of the Controlled Person.

"Agreement" shall have the meaning ascribed to such term in the preamble of this Agreement.

"Asset Disposition" shall mean any sale, lease, license, consignment, transfer or other disposition of assets, rights or property by any Person, including any disposition in connection with a sale-leaseback transaction or synthetic lease and any transfer, sale, disposition or assignment of any Collateral.

"Borrower" shall have the meaning ascribed to such term in the preamble of this Agreement.

"Business Day" shall mean any day other than a Saturday, Sunday or day which shall be in the State of New York or the State of Florida a legal holiday or day on which banking institutions are required or authorized to close.

"Capital Lease" shall mean, with respect to any Person, a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board) is required to be, classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligations" shall mean, for any period for which the amount thereof is to be determined, any obligation of such Person to pay rent or other amounts under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Cash Equivalents" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; *provided, however,* that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed three hundred sixty five (365) days.

"Chattel Paper" shall have the meaning set forth in Article 9 of the UCC.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall mean all of the Borrower's right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Borrower (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Borrower, and regardless of where located, including:

(i)      all Accounts;

(ii)     all Chattel Paper;

(iii)    all Documents;

(iv)     all Equipment;

(v)      all Fixtures;

(vi)     all General Intangibles;

(vii)    all Goods;

(viii)   all Intellectual Property;

(ix)     all Instruments;

(x)      all Inventory;

(xi)     all Investment Property;

(xii)    all cash or Cash Equivalents;

(xiii)   all letters of credit, Letter-of-Credit Rights and Supporting Obligations;

(xiv)    all Deposit Accounts with any bank or other financial institution;

(xv)     all Commercial Tort Claims;

(xvi)    the LLC Agreement;

(xvii)   the Pledged Collateral;

(xviii)  all other assets and property of Borrower; and

(xix)    all accessions to, substitutions for and replacements, proceeds (including Stock Rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing.

"Commercial Tort Claims" means the commercial tort claims as defined in Article 9 of the UCC.

"Contingent Obligation" shall mean any obligation of a Person arising from a guaranty, indemnity or other assurance of payment or performance of any Indebtedness, lease, dividend or other obligation ("primary obligations") of another obligor ("primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person under any (a) guaranty, endorsement, co-making or sale with recourse of an obligation of a primary obligor; (b) obligation to make take-or-pay or similar payments regardless of nonperformance by any other party to an agreement; and (c) arrangement (i) to purchase any primary obligation or security therefor, (ii) to

supply funds for the purchase or payment of any primary obligation, (iii) to maintain or assure working capital, equity capital, net worth or solvency of the primary obligor, (iv) to purchase property or services for the purpose of assuring the ability of the primary obligor to perform a primary obligation, or (v) otherwise to assure or hold harmless the holder of any primary obligation against loss in respect thereof.  The amount of any Contingent Obligation shall be deemed to be the stated or determinable amount of the primary obligation (or, if less, the maximum amount for which such Person may be liable under the instrument evidencing the Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto.

"Default" shall mean any Event of Default and any event which with the giving of notice or lapse of time, or both, would become an Event of Default.

"Default Rate" shall mean, for any date of determination, the sum of the applicable Interest Rate (defined in **Section 1.03** herein) in effect on such date plus five percent (5%).

"Deposit Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Disqualified Equity Interests" shall mean any Equity Interest or Equity Interests Equivalent that, by its terms (or by the terms of any Equity Interests or Equity Interests Equivalent into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition:

(a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loan and all other Obligations that are accrued and payable),

(b) provides for the scheduled payments of dividends in cash

(c) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests of the applicable Person and except as permitted by clause (a) above), in whole or in part, or

(d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests or Equity Interests Equivalents that would constitute Disqualified Equity Interests,

in the case of each of clauses (a), (b), (c) and (d) hereof, prior to the date that is 181 days after the Maturity Date.

"Documents" shall have the meaning set forth in Article 9 of the UCC.

"Effective Date" shall mean the date of this Agreement.

"Equipment" shall have the meaning set forth in Article 9 of the UCC.

"Equity Interests" shall mean all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Equity Interests Equivalents" shall mean all securities convertible into or exchangeable for Equity Interests and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Equity Interests, whether or not presently convertible, exchangeable or exercisable.

"Event of Default" shall mean any Event of Default described in **Article VI**.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Fixtures" shall have the meaning set forth in Article 9 of the UCC.

"GAAP" means generally accepted accounting principles and practices set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, as applicable, approved by the same from time to time) or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"General Intangibles" shall have the meaning set forth in Article 9 of the UCC.

"Goods" shall have the meaning set forth in Article 9 of the UCC.

"Governmental Authority" shall mean any federal, state, local, foreign or other agency, authority, body, commission, court, instrumentality, political subdivision, central bank, or other entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions for any governmental, judicial, investigative, regulatory or self-regulatory authority (including the Financial Conduct Authority, the Prudential Regulation Authority and any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" shall mean all direct and indirect guarantees, sales with recourse, endorsements (other than for collection or deposit in the ordinary course of business) and other obligations (contingent or otherwise, including interest that would accrue during the pendency of any proceeding under any liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor

relief laws, regardless of whether allowed or allowable in such proceeding) by any Person to pay, purchase, repurchase or otherwise acquire or become liable upon or in respect of any Indebtedness of any other Person, and, without limiting the generality of the foregoing, all obligations (contingent or otherwise) by any Person to purchase products, supplies or other property or services for any Person under agreements requiring payment therefor regardless of the non-delivery or non-furnishing thereof, or to make investments in any other Person, or to maintain the capital, working capital, solvency or general financial conditions of any other Person, or to indemnify any other Person against and hold him harmless from damages, losses and liabilities, all under circumstances intended to enable such other Person or Persons to discharge any Indebtedness or to comply with agreements relating to such Indebtedness or otherwise to assure or protect creditors against loss in respect of such Indebtedness.  The amount of any Guarantee shall be deemed to be the amount of the Indebtedness of, or damages, losses or liabilities of, the other Person or Persons in connection with which the Guarantee is made or to which it is related unless the obligations under the Guarantee are limited to a determinable amount, in which case the amount of such Guarantee shall be deemed to be such determinable amount.  The term "Guarantee" as a verb has a corresponding meaning.

"Indebtedness" shall mean, as to any Person at a particular time, without duplication, the following: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (b) the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person, (c) net obligations of such Person under any Swap Contract, (d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts and accrued expenses payable in the ordinary course of business and not overdue by more than 90 days), (e) all earn-out or similar obligations of such Person, (f) indebtedness in respect of the foregoing (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse, (g) all Capital Lease Obligations, (h) all obligations of such Person in respect of Disqualified Equity Interests, (i) the principal balance of synthetic leases or other off-balance sheet financing arrangements, (j) all Contingent Obligations of such Person, and (k) all Guarantees of such Person in respect of any of the foregoing.  For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Indebtedness.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) (to the extent that such Indebtedness is non-recourse to such Person for amounts in excess of the value of the property securing such Indebtedness) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"<u>Indemnified Taxes</u>" means (a) Non-Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"<u>Insolvency Event</u>" with respect to any Person, shall occur when (A) such Person shall (i) apply for or consent to the appointment of a receiver, trustee or liquidator of it or any of its property, (ii) make a general assignment for the benefit of creditors, (iii) be adjudicated a bankrupt or insolvent or (iv) file a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer acquiescing to, or admitting the material allegations of, a petition filed against it in any proceeding under any such law or if corporate action shall be taken for the purpose of effecting any of the foregoing, or (B) an order, judgment or decree shall be entered, without the application, approval or consent of any such Person by any court of competent jurisdiction, approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of such party or of all or a substantial part of the assets of such Person, <u>provided</u>, <u>however</u>, with respect to such involuntary proceedings, such Person shall have thirty (30) days from the date of such order, judgment or decree to discharge or stay the same.

"<u>Instruments</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Intellectual Property</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Interest Rate</u>" shall mean a rate *per annum* equal to seven point eight five seven one four three percent (7.857143%).

"<u>Interest Payment Date</u>" shall mean the final Business Day of each calendar quarter; <u>provided</u> that, the first Interest Payment Date shall be December 31, 2021.

"<u>Inventory</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Investment</u>" shall mean, with respect to any Person, any loan, advance or extension of credit (other than to customers in the ordinary course of business) by such Person to, or any Guarantee or other contingent liability with respect to the Equity Interests, Indebtedness or other obligations of, or any contributions to the capital of, any other Person, or any ownership, purchase or other acquisition by such Person of any interest in any Equity Interests, or other securities of any such other Person, including without limitation any Acquisition; and "<u>Invest</u>," "<u>Investing</u>" or "<u>Invested</u>" shall mean the making of an Investment.

"<u>Investment Property</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Laws</u>" shall mean, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof,

and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lenders" shall have the meaning ascribed to such term in the preamble of this Agreement.

"Lending Office" shall mean the office or offices of any Lender set forth opposite its name on the signature page hereto, as updated from time to time.

"Letter-of-Credit Rights" shall have the meaning set forth in Article 9 of the UCC.

"Lien" shall mean, with respect to any interest in assets or property (whether real, personal or mixed and whether tangible or intangible) (a) any interest or right which secures the payment of Indebtedness or an obligation owed to, or a claim by, a Person other than the owner of such property, whether such interest is based on common law, statute or contract, and whether or not choate, vested or perfected, including any such interest or right arising from a mortgage, charge, pledge, assignments, security interest, conditional sale, levy, execution, seizure, attachment, garnishment, conditional sale, Capital Lease or trust receipt, or arising from a lease, consignment or bailment given for security purposes, and (b) any exception to or defect in the title to or ownership interest in such assets or property, including reservations, rights of entry, possibilities of reverter, encroachments, easements, rights of way, restrictive covenants, leases and licenses.  For purposes of this Agreement, the Borrower shall be deemed to be the owner of any asset or property which it has acquired or holds subject to a conditional sale agreement, Capital Lease or other arrangement pursuant to which title to such asset or property has been retained by or vested in some other Person for security purposes.

"LLC Agreement" shall mean each of (a) the Fourth Amended and Restated LLC Operating Agreement of 777 Partners LLC, as amended by the First Amendment thereto, dated as of September 17, 2021, and (b) Third Amended and Restated LLC Operating Agreement of 600 Partners LLC, as amended by the First Amendment thereto, dated as of September 17, 2021.

"Loan" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Loan Documents" shall mean, collectively, this Agreement and each other agreement, instrument, document and certificate executed and delivered to, or in favor of, any Lender and including each other pledge, power of attorney, consent, assignment, contract, notice, and each other written matter whether heretofore, now or hereafter executed by or on behalf of the Borrower, and delivered to any Lender in connection with this Agreement or the transactions contemplated hereby.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Maturity Date" shall mean September 30, 2031.

"<u>Non-Excluded Taxes</u>" shall mean any Taxes other than, to the extent imposed on or with respect to a recipient of any payment to be made to or for the account of any Lender or required to be withheld or deducted from a payment to or for the account of any Lender (a), Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of or having its principal office or applicable lending office located in the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from a Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transactions pursuant to or enforced any Loan Document, except any such Taxes imposed with respect to an assignment of the Loan) (such Taxes described in this subclause (ii), "Other Connection Taxes") (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, (c) Taxes attributable to such Lender's failure to comply with Section 1.04(d)(v) and (d) any withholding Taxes imposed under FATCA.

"<u>Obligations</u>" shall mean all promises, Indebtedness, obligations and liabilities of the Borrower to the Lenders whatsoever, of every kind and description, direct or indirect, secured or unsecured, joint and several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising, regardless of how the same arise or by what instrument, agreement or book account they may be evidenced, or whether evidenced by any instrument, agreement or book account; including without limitation, all loans (including by renewal or extension), all Indebtedness, all undertakings to take or refrain from taking any action; and all interest (including interest accruing after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law), taxes, fees (including servicing fees), charges, expenses and attorneys' fees chargeable to the Borrower or incurred by the Lenders or the Security Agent in connection with the Loan Documents or the Loan.

"<u>Organic Documents</u>" shall mean, with respect to any Person, its charter, certificate or articles of incorporation or formation, bylaws, articles of organization, limited liability agreement, operating agreement, members agreement, shareholders agreement, partnership agreement, certificate of partnership, certificate of formation, voting trust agreement, or similar agreement or instrument governing the formation or operation of such Person.

"<u>Other Taxes</u>" shall mean any and all stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under this Agreement or from the execution, delivery, registration, recording or enforcement of this Agreement, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"<u>Person</u>" shall mean any natural person, corporation, firm, joint venture, partnership, limited partnership, limited liability company, association, trust or other entity or organization,

whether acting in an individual, fiduciary or other capacity, or any government or political subdivision thereof or any agency, department or instrumentality thereof.

"Pledged Collateral" shall have the meaning set forth in **Section 1.05(c)**.

"Pledged Equity" shall have the meaning set forth in **Section 1.05(c)**.

"Preferred Units" shall mean $100 million in preferred membership interests in each of 777 Partners LLC and 600 Partners LLC.

"Purchase Money Debt" shall mean (a) Indebtedness (other than the Obligations) incurred and used for payment of any of the purchase price of fixed assets, (b) any Capital Lease of fixed assets, and (c) Indebtedness (other than the Obligations) incurred within ten (10) days before or after acquisition of any fixed assets, for the purpose of financing any of the purchase price thereof; provided, that, in no event shall the amount of Purchase Money Debt exceed the purchase price of the assets being financed in respect thereof.

"Qualified Equity Interests" shall mean any Equity Interests or Equity Interests Equivalents that are not Disqualified Equity Interests.

"Responsible Officer" shall mean the chief executive officer, president, senior vice president, senior vice president (finance), vice president, chief compliance officer, environmental compliance officer, chief financial officer, treasurer, manager of treasury activities or assistant treasurer or other similar officer or Person performing similar functions of the Borrower. To the extent requested by any Lender, each "Responsible Officer" will provide an incumbency certificate and to the extent requested by such Lender, appropriate authorization documentation, in form and substance reasonably satisfactory to such Lender. Any document delivered hereunder that is signed by a Responsible Officer of the Borrower shall be conclusively presumed to have been authorized by all necessary limited liability company action on the part of the Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of the Borrower.

"Restricted Payment" shall mean (a) any declaration or payment of a distribution, interest or dividend on, any payment on account of, or any setting apart assets for a sinking or other analogous fund for, any Equity Interest or Equity Interests Equivalents, (b) any distribution, advance or repayment of any Indebtedness to a direct or indirect holder of Equity Interests or Equity Interests Equivalents, (c) any purchase, redemption, or other acquisition or retirement for value of, or any setting apart assets for a sinking or other analogous fund for the purchase, redemption, or other acquisition or retirement for value of, any Equity Interest or Equity Interests Equivalents or (d) the payment of any management fees or other fees or similar compensation paid to any direct or indirect holder of Equity Interests or Equity Interests Equivalents of the Borrower or any of its Affiliates.

"Security Agent" shall have the meaning set forth in **Section 1.05(c)**.

"Solvent" shall mean, as to any Person, such Person (a) owns property whose present fair salable value (as defined below) is greater than the probable total liabilities (including

contingent, subordinated, unmatured and unliquidated liabilities) of such Person as they become absolute and matured, (b) is able to pay all of its debts as they mature, and (c) has capital that is not unreasonably small for its business and is sufficient to carry on its business and transactions and all business and transactions in which it is about to engage.  "Fair salable value" shall mean the amount that could be obtained for assets within a reasonable time, either through collection or through sale under ordinary selling conditions by a capable and diligent seller to an interested buyer who is willing (but under no compulsion) to purchase.

"Stock Rights" shall mean all dividends, instruments or other distributions and any other right or property which the Borrower shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Equity Interest constituting Collateral, any right to receive any Equity Interest constituting Collateral and any right to receive earnings, in which such Grantor now has or hereafter acquires any right, issued by an issuer of such Equity Interest.

"Subsidiary" of any Person shall mean (i) any corporation of which more than 50% of the outstanding Equity Interests and Equity Interests Equivalents of any class or classes having ordinary voting power for the election of directors (irrespective of whether or not at the time Equity Interests or Equity Interests Equivalents of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is now or hereafter owned directly or indirectly by such Person, by such Person and one or more of its Subsidiaries, or by one or more of such Person's other Subsidiaries, (ii) any partnership, association, limited liability company, joint venture or other entity in which such Person, such Person and one or more of its Subsidiaries, or one or more of its Subsidiaries, is either a general partner or has an equity or voting interest of more than 50% at the time, and (iii) any other entity which is directly or indirectly controlled by such Person or one or more Subsidiaries of such Person or both.

"Supporting Obligations" shall have the meaning set forth in Article 9 of the UCC.

"Taxes" shall mean all income, stamp or other taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"UCC" shall mean  the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction..

 "U.S. Person" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the U.S. Internal Revenue Code of 1986, as amended from time to time.

**1.02.  [Reserved].**

**1.03.  The Loan.** On the Effective Date, each Lenders shall lend to the Borrower its pro rata share of the amount of the Loan in same day funds in accordance with the amounts and

wire instructions set forth on Schedule 1.03, it being understood that the pro rata share of the Loan to be funded by each of the Lenders shall be the amount set forth opposite such Lender's name under the heading "Dollar Allocation" on Schedule A hereto.  Following the funding referred to in the immediately prior sentence, no Lender shall have any obligation to fund any further Loan hereunder.  The outstanding principal amount of the Loan shall accrue interest at the Interest Rate from the Effective Date until the date the Loan is repaid in full in cash.  For the avoidance of doubt, each Lender shall only be responsible for funding its pro rata share thereof and shall have no liability for any other Lender's failure to fund its pro rata share.

### 1.04.  <u>Repayment and Reversion; Payments.</u>

(a)  The Borrower may repay the Loan, in whole or in part, with no prepayment or other penalties, at any time.  The Borrower agrees to pay (i) on each Interest Payment Date, all unpaid interest accrued on the Loan at the Interest Rate after the previous Interest Payment Date, and (ii) on the Maturity Date, all amounts outstanding under the Loan (including all accrued and unpaid interest).

(b) All payments by the Borrower to the Lenders hereunder shall be made without setoff, deduction or counterclaim not later than 2:00 p.m. (New York City time) on the date due in same day or immediately available funds in US Dollars to such account as the applicable Lender shall specify from time to time by notice to the Borrower. Funds received after 2:00 p.m. (New York City time) on any day shall be deemed to have been received by the applicable Lender on the next succeeding Business Day. All interest and fees shall be computed on the basis of a 365-day year for the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable. Payments due on other than a Business Day shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.  All payments of the Loans and other Obligations shall be shared by the Lenders based on their pro rata share of the applicable Obligations.

(c) All amounts received as a result of the exercise of remedies hereunder or under applicable Law (including, for the avoidance of doubt, any amount received by the Security Agent hereunder) shall be applied upon receipt to the Obligations as follows: (i) first, to the payment in full in cash of all interest (including interest accruing after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing hereunder, and all costs and expenses owing to the Lenders pursuant to the terms of hereof, until paid in full in cash, (ii) second, after payment in full in cash of the amounts specified in clause (i), to the payment of the principal amount of the Loan then outstanding, and (iii) third, after payment in full in cash of the amounts specified in clauses (i) and (ii), to the payment of all other Obligations owing to the Lenders.  If amounts are insufficient to satisfy a category, they shall be paid ratably among outstanding Obligations in such category.

(d) The Borrower covenants and agrees as follows with respect to Taxes:

(i)    Any and all payments by the Borrower hereunder shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding

for or on account of, any Taxes, except as required by applicable Law. In the event that any Taxes are imposed and required to be deducted or withheld from any payment required to be made by the Borrower to or on behalf of a Lender hereunder, then:

(A)    the amount of such payment shall be increased as may be necessary so that such payment is made, after withholding or deduction for or on account of such Taxes, in an amount that is not less than the amount provided for herein; and

(B)    the Borrower shall deduct or withhold the full amount of such Taxes from such payment (as increased pursuant to clause (A)) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable Law.

(ii)    In addition, the Borrower shall pay all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable Law.

(iii)    As promptly as practicable after the payment of any Taxes or Other Taxes, and in any event within 45 days of any such payment being due, the Borrower shall furnish to the applicable Lender a copy of an official receipt (or a certified copy thereof) evidencing the payment of such Taxes or Other Taxes.

(iv)    The Borrower shall indemnify each Lender for any Indemnified Taxes levied, imposed or assessed on such Lender whether or not such Indemnified Taxes are correctly or legally asserted by the relevant Governmental Authority. Promptly upon written notice that any such Indemnified Taxes have been levied, imposed or assessed, and promptly upon notice thereof by a Lender, the Borrower shall pay such Indemnified Taxes directly to the relevant Governmental Authority (provided that such Lender shall not be under any obligation to provide any such notice to the Borrower). With respect to indemnification for Indemnified Taxes actually paid by a Lender or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date such Lender makes written demand therefor. In addition, the Borrower shall indemnify each Lender for any incremental Taxes that may become payable by such Lender as a result of any failure of the Borrower to pay any Taxes when due to the appropriate Governmental Authority or to deliver to such Lender, pursuant to clause (iii), documentation evidencing the payment of Indemnified Taxes.

(v) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (v)(1)(A), (1)(B) and (1)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any

material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(1) Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A) any Lender that is a U.S. Person shall deliver to the Borrower on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Lender that is not a U.S. Person (a "Non-U.S. Lender") shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or about the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), whichever of the following is applicable:

(a) in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(b) executed copies of IRS Form W-8ECI;

(c) in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W 8BEN-E; or

(d) to the extent a Non-U.S. Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W 8BEN-E, a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner;

(C) any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or about the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

(vi)      Each party's obligations under this clause (e) shall survive any assignment of rights by a Lender, termination of this Agreement and the payment in full of the Obligations.

(vii)      To the extent that any Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of, any Taxes, Other Taxes or Non-Excluded Taxes it has been indemnified by the Borrower hereunder, including by the payment of additional amounts pursuant to this section, such Lender shall promptly pay the amount of such refund or credit to the Borrower (but only to the extent of indemnity payments made hereunder with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).

**1.05.  Security Interest.**

(a) To secure the Loan and the Obligations, the Borrower hereby grants to the Security Agent, its successors and assigns, for the ratable benefit of the Lenders, a valid and first-priority security interest in the Collateral and the proceeds therefrom, and the Borrower agrees to take all necessary actions requested by the Security Agent (acting on the instructions of the Lenders) in order to create, perfect and maintain such security interest (including authorizing the Security Agent, the Lenders and/or their designee to prepare and file financing statements provided for by the Uniform Commercial Code as in effect in the applicable jurisdictions designating the Collateral and the proceeds therefrom as the collateral hereunder) within five (5) business days of the Loan funding.  The Borrower agrees to promptly execute and deliver or cause to be executed and delivered to the Security Agent any additional and/or supplemental other instruments and documents from time to time as the Security Agent or the Lenders deems necessary or appropriate to create and maintain the Security Agent's security interest or for the performance of the Borrower's obligations under this Agreement or to effectuate more perfectly the intent of this Agreement. Following the full repayment in cash of the Loan and all interest accrued thereon and the satisfaction in full of all other Obligations, at the request and expense of the Borrower, the Security Agent shall execute a release of the security interest created pursuant to this **Section 1.05**.

(b)  As security for the payment or performance, as the case may be, in full of the Obligations and the other indebtedness and obligations of Borrower to the Lenders under this Agreement, Borrower hereby pledges to the Security Agent, its successors and assigns, for the ratable benefit of the Lenders, and hereby grants to the Security Agent, its successors and assigns, for the ratable benefit of the Lenders, a security interest in, all of Borrower's right, title and interest in, to and under the following: (A) all Equity Interests owned by it, including the Preferred Units, and any other Equity Interests obtained in the future by Borrower and the certificates (if any) representing all such Equity Interests (the "Pledged Equity"); and (B) all other property that may be delivered to and held by Security Agent pursuant to the terms hereof; (C) all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the securities referred to in clauses (A) and (B) above; (D) all rights and privileges of Borrower with respect to the securities and other property referred to in clauses (A), (B) and (C) above; and (E) all proceeds of any of the foregoing (the items referred to in clauses (A) through (E) above being collectively referred to as the "Pledged Collateral").  TO

HAVE AND TO HOLD the Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Security Agent, its successors and assigns, for the ratable benefit of the Lenders, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

(c) Solely for the purpose of the grant of security interests hereunder and under the other Loan Documents, each Lender hereby authorizes and appoints 777 Asset Management LLC as its agent (the "Security Agent") to hold the Collateral (and any other collateral pledged under the Loan Documents) for and on behalf of itself and the other Lenders. For greater certainty, notwithstanding such appointment, all decisions regarding the administration and enforcement of the Liens granted hereunder and under the other Loan Documents shall be made by unanimous consent of the Lenders. The use of the term "Security Agent" as used in this clause is intended to connote the same fiduciary duty that owing by any collateral agent to the Lenders.

(d) The Borrower hereby irrevocably constitutes and appoints each Lender and the Security Agent (and all Persons designated thereby) as the Borrower's true and lawful attorney (and agent-in-fact) for the purposes provided in this clause (d). Each Lender, the Security Agent or their respective designee, may (in its discretion), without notice and in either its or the Borrower's name, but at the cost and expense of the Borrower:

(i) Endorse the Borrower's name on any proceeds of Collateral (including proceeds of insurance) that come into such Person's possession or control; and

(ii) During an Event of Default, (1) notify any account debtors of the assignment of their Accounts, demand and enforce payment of Accounts by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (2) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (3) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as such Person deems advisable, subject to any requirements of the UCC and other applicable Laws; (4) collect, liquidate and receive balances in Deposit Accounts or investment accounts, and take control, in any manner, of proceeds of Collateral; (5) prepare, file and sign the Borrower's name to a proof of claim or other document in a bankruptcy of an account debtor, or to any notice, assignment or satisfaction of Lien or similar document; (6) receive, open and dispose of mail addressed to the Borrower, and notify postal authorities to deliver any such mail to an address designated by the Lenders or the Security Agent; (7) endorse any Chattel Paper, Document, Instrument, bill of lading, or other document or agreement relating to any Accounts, Inventory or other Collateral; (8) use the Borrower's stationery and sign its name to verifications of Accounts and notices to account debtors; (9) use information contained in any data processing, electronic or information systems relating to Collateral; (10) make and adjust claims under insurance policies; (11) take any action as may be necessary or appropriate to obtain payment under any letter of credit, banker's acceptance or other instrument for which the Borrower is a beneficiary; (12) exercise any voting or other rights relating

to Investment Property; and (13) take all other actions as the Lenders deem appropriate to fulfill the Borrower's obligations under the Loan Documents.

(e) Borrower agrees to deliver or cause to be delivered to Security Agent, promptly, any and all certificates (if any) representing Pledged Equity, accompanied by proper instruments of assignment duly executed by Borrower or other instruments of transfer reasonably satisfactory to the Lenders and by such other instruments or documents as any Lender may reasonably request.

(f) Unless and until an Event of Default shall have occurred and be continuing:

(i)    Borrower shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Collateral or any part thereof; and

(ii)    Borrower shall, subject to the terms of this Agreement, be entitled to receive and retain any and all dividends and other distributions paid on or distributed in respect of the Pledged Collateral; provided, however, that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Equity or received in exchange for Pledged Equity or any part thereof, or in redemption thereof, or as a result of any merger, amalgamation, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by Borrower, shall be held in trust for the benefit of the Lenders and shall be forthwith delivered to the Security Agent in the same form as so received (with any necessary endorsement).

(g) Upon the occurrence and during the continuance of an Event of Default:

(i)    all rights of Borrower to dividends or other distributions that Borrower is authorized to receive pursuant to clause (d) above shall cease, and all such rights shall thereupon become vested in Security Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions as Pledged Collateral hereunder. All dividends, interest, principal or other distributions received by Borrower contrary to the provisions of this clause (f) shall be held in trust for the benefit of the Lenders, shall be segregated from other property or funds of Borrower and shall be forthwith delivered to Security Agent upon demand in the same form as so received (with any necessary endorsement); and

(ii)    all rights of Borrower to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to clause (d) and all such rights shall thereupon become vested in Security Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; provided that, Lender may, in its sole discretion, permit Borrower to exercise such rights from time to time during the continuance of an Event of Default.

**1.06.  Indemnification.**  The Borrower shall indemnify and hold harmless each Lender, the Security Agent and each of their respective Affiliates, and their respective partners, directors, officers, employees, attorneys agents and advisors (collectively the "Indemnitees") against, and

hold each Indemnitee harmless from any and all losses, claims (whether brought by the Borrower or any other third party), damages, liabilities, and related expenses (including the costs, fees, charges and disbursements of any counsel and experts for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or the Borrower, arising out of, in connection with, or as a result of the execution, enforcement or delivery of this Agreement, any other document in this or a related transaction or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, except to the extent that (i) such loss, claim, damage, liability or related expense relates to the gross negligence, fraud or willful misconduct of an Indemnitee or (ii) such Indemnitee has been compensated for such loss, claim, damage, liability or related expense pursuant to the terms of any insurance policy or any other agreement or instrument.  To the fullest extent permitted by applicable law, the parties shall not assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential (including but not limited to lost profits and diminution in value) or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, enforcement of, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loan or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, unless such disclosure resulted from the gross negligence, fraud or willful misconduct of such Indemnitee, as determined by a final non-appealable order of a court of competent jurisdiction. The agreements in this subsection shall survive the repayment, satisfaction or discharge of all the other obligations and liabilities of the Borrower under the Agreement.

**1.07. <u>Costs and Expenses.</u>**  The Borrower agrees to pay, or reimburse, the Security Agent and the Lenders for all expenses reasonably incurred for the preparation of this Agreement, including exhibits, and any amendments hereto or consents or waivers hereunder or thereunder as may from time to time hereafter be required thereby or by the transactions contemplated hereby, including, but not limited to, the fees and out-of-pocket expenses of the Security Agent and the Lenders, charges and disbursements of special counsel to the Lenders from time to time incurred in connection with the preparation and execution of this Agreement, the other Loan Documents and any document relevant to this Agreement, any amendments hereto or thereto, or consents or waivers hereunder or thereunder, and the consideration of legal questions relevant hereto and thereto. The Borrower agrees to pay, or reimburse, the Security Agent and the Lenders upon demand for all costs and expenses (including attorneys', auditors' and accountants' fees and expenses) reasonably incurred and arising out of the transactions contemplated by this Agreement, in connection with any work-out or restructuring of the transactions contemplated hereby and any collection or enforcement of the obligations of the Borrower hereunder, whether or not suit is commenced, including attorneys' fees and legal expenses in connection with any appeal of a lower court's order or judgment.  The obligations of the Borrower under this **Section 1.07** shall survive any termination of this Agreement.

**1.08. <u>Lender Manner of Acting.</u>** With respect to any provision requiring the consent of, or a waiver by, the Lenders, such consent or waiver shall be deemed to have been provided

upon all of the Lenders having so consented or waived; provided that the consent or waiver of each Lender shall be required to: (i) increase the amount of the Loan; (ii) reduce the amount of, or waive or delay payment of, any principal, interest or fees payable to the Lenders; (iii) extend the Maturity Date; (iv) release all or substantially all Collateral (unless such release is in connection with the repayment in full of all Obligations); (v) release the Borrower from liability for any Obligations; or (vi) amend this **Section 1.08.**

## II.  REPRESENTATIONS AND WARRANTIES OF THE BORROWER

To induce the Lenders to enter into this Agreement and to extend the Loan to the Borrower, the Borrower represents and warrants to the Lenders (which representations and warranties shall survive the repayment, satisfaction or discharge of all the Obligations and liabilities of the Borrower under the Agreement) that:

**2.01.**  **Organization and Qualification.**  The Borrower (a) is duly organized, validly existing and in good standing under the laws of the State of Delaware, (b) has the power and authority to own its properties and to carry on business as now being conducted and is qualified to do business in every jurisdiction where such qualification is necessary, and (c) has the legal and corporate power to execute and deliver the Loan Documents to which it is a party, to perform its obligations under such Loan Documents and to execute and deliver to the Lenders any other instruments required under the Loan Documents.  The Borrower has all licenses, permits and rights necessary to carry on its business as now conducted and to own and operate its property and business.

**2.02.  Due Authorization and Execution.**

(a) The Borrower has taken all necessary action to authorize the terms and conditions of this Agreement and to authorize the execution, delivery and performance of the Loan Documents to which the Borrower is a party and any other agreements referred to therein or related thereto.

(b) All consents, licenses, approvals or authorizations of, or registrations or declarations with, any governmental authority, bureau or agency which are required in connection with the execution, delivery, performance, validity or enforceability of the Loan Documents and any other agreements referred to therein have been duly obtained and are in full force and effect.

(c) The execution, delivery and performance of each Loan Document to which the Borrower is a party, including the security interest created by this Agreement, and any other agreement referred to therein does not conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any provision of any existing law or regulation or of any order or decree of any court or governmental authority, bureau or agency or of the organizational documents of the Borrower or of any indenture, contract or other agreement to which the Borrower is a party or which purports to be binding upon it or upon any of its properties or assets.

(d) Each Loan Document to which the Borrower is a party and any other documents

executed by the Borrower in connection herewith, are the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and except as certain remedies thereunder may be subject to equitable principles.

2.03. **Capitalization; Subsidiaries**.  The authorized Equity Interests and Equity Interests Equivalents of the Borrower are as set forth on **Schedule 2.03**.  All issued and outstanding Equity Interests and Equity Interest Equivalents of the Borrower are duly authorized and validly issued, fully paid, nonassessable, and free and clear of all Liens, and all such Equity Interests and Equity Interest Equivalents were issued in compliance with all applicable Laws.  The identity of the holders of the Equity Interests and Equity Interest Equivalents of the Borrower and the amount of the Equity Interests and Equity Interest Equivalents of the Borrower so held by such holders is set forth on **Schedule 2.03**.  As of the date hereof, the Borrower has no Subsidiaries, and does not own or hold any Equity Interests or Equity Interest Equivalents of any other Person.

2.04. **Litigation; etc**.  There is no action, suit, claim, demand, disputes, cause of action, proceeding, arbitration or investigation at law or equity, or before or by any federal, state, local or other governmental department, commission, court, tribunal, board, bureau, agency or instrumentality, domestic or foreign, pending or threatened in writing, against or affecting the Borrower or any of its business or assets.

2.05. **Compliance with Law**.  The Borrower is not (a) in default or breach with respect to any judgment, order, writ, injunction, rule, regulation or decree of any court, governmental authority, department, commission, agency or arbitration board or tribunal or (b) in violation of any Law, rule, regulation, ordinance or order relating to its business or its property.

2.06. **Borrower Activities**.  The Borrower (a) has not engaged in any activities other than acting as a holding company in respect of the Preferred Unit and transactions incidental thereto, maintaining its limited liability company existence, and entering into and performing its obligations under this Agreement and the LLC Agreement, (b) does not hold or own any assets other than the Collateral, and (c) does not have any liabilities other than under this Agreement and obligations incurred in the ordinary course of business related to its existence, including taxes, franchise or other entity existence taxes and fees payable to the State of Delaware.

2.07. **Title to Assets**.  The Borrower holds good title to all of its property and assets (including, without limitation, the Collateral), in each case, free and clear of all Liens.  The Borrower has paid and discharged all lawful claims that, if unpaid, could become a Lien on its properties.

2.08. **Margin Stock**.  No part of the Loan shall be used at any time by the Borrower to purchase or carry margin stock (within the meaning of Regulations T, U and X) or to extend credit to others for the purpose of purchasing or carrying any margin stock.  The Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purposes of purchasing or carrying any such margin stock.  No part of the proceeds of Loan will

be used by the Borrower for any purpose which violates, or which is inconsistent with, any regulations promulgated by the Board of Governors of the Federal Reserve System.

**2.09.  Not a Regulated Entity.**  The Borrower is not (a) registered or required to be registered as an "investment company," or an "affiliated person" of, or a "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended, or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other applicable Law regarding its authority to incur Indebtedness. The making of the Loan, the application of the proceeds and repayment thereof by the Borrower and the performance by the Borrower of the transactions contemplated by this Agreement will not violate any provision of said Laws, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.

**2.10.  Accuracy of Information**.  All written information pertaining to the Borrower, furnished by or on behalf of the Borrower to the Security Agent or the Lenders for purposes of or in connection with this Agreement or any transaction contemplated by this Agreement is, and all other such information furnished by or on behalf of the Borrower to the Security Agent or the Lenders will be, when considered as a whole, complete and correct in all material respects and did not and will not, when delivered, contain any untrue statement of material fact or omit to state a fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements have been made (after giving effect to all supplements thereto).

**2.11.  No Assets or Liabilities.**

(a)     Borrower does not currently engage in, and, since the formation or organization of Borrower, Borrower has never engaged in, any business, operations or activity other than (A) negotiating and entering into this Agreement and the LLC Agreement, (B) complying with the requirements of applicable law, (C) maintaining its limited liability company existence, (D) maintaining books and records, and (E) de minimis activities incidental to the foregoing.

(b)     Borrower does not currently own, hold, lease, operate or have possession of, and, since the formation or organization of Borrower, Borrower has never owned, held, leased, operated or had possession of, any assets other than the Preferred Units and its rights under the LLC Agreement.

(c)     Borrower does not currently have, and, since the formation or organization of Borrower, Borrower has never incurred, created, assumed or otherwise become liable for, any obligations, liabilities or indebtedness other than (A) obligations or liabilities under the this Agreement and the LLC Agreement, and (B) de minimis obligations in connection with its

compliance with the requirements of applicable law and its maintenance of its limited liability company existence.

**2.12.  Solvency**.  After giving effect to the making of the Loan hereunder and the consummation of the other transactions contemplated hereby on the date hereof, the Borrower is Solvent.

**2.13. Brokers' Fees**.  The Borrower has no obligation to any Person in respect of any finder's, broker's or investment banker's fee in connection with the transactions contemplated hereby.

**2.14.  Foreign Assets Control Regulations and Anti-Money Laundering**.  The Borrower, its directors, officers and, to its knowledge, employees, are in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control, and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  The Borrower, its directors, officers and, to its knowledge, employees, (i) are not a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) are not a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person and (iii) are not controlled by (including by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement would be prohibited under U.S. law.  No proceeds of the Loan will be used in a way that would cause the Borrower or any Lender to violate U.S. economic sanctions laws.

**2.15.  Patriot Act**.  The Borrower and each Affiliate of the Borrower is in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations.  No part of the proceeds of the Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

**2.16.  Security Interest**.  The security interest granted under Section 1.05 constitutes (i) a legal and valid security interest in favor the Security Agent, for the ratable benefit of the Lenders, in all of the Collateral securing the payment and performance of the indebtedness and obligations of Borrower to the Lenders under this Agreement, and (ii) subject to the filing of an appropriate financing statement with the Secretary of State of the State of Delaware, a perfected first priority security interest in all of the Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States

or any State thereof pursuant to the UCC or other applicable law in such jurisdictions. By virtue of the execution and delivery by Borrower, Security Agent and the Lenders of this Agreement, this Agreement is effective to create a legal, valid and enforceable security interest in favor of the Security Agent, for the ratable benefit of the Lenders, in the Pledged Collateral and, when any Pledged Collateral are delivered to Security Agent in accordance with this Agreement, the Security Agent, for the ratable benefit of the Lenders, will obtain a perfected first priority lien upon and security interest in such Pledged Collateral as security for the payment and performance of the indebtedness and obligations of Borrower to the Lenders under this Agreement.

**2.17. Collateral.**

(a) **Schedule 2.17(a)** sets forth (i) the Borrower's jurisdiction of organization, (ii) the location of the Borrower's chief executive office and (iii) the Borrower's exact legal name as it appears on its organizational documents.

(b) **Schedule 2.17(b)** sets forth all Deposit Accounts maintained by the Borrower.

(c) **Schedule 2.17(c)** sets forth all Intellectual Property owned by the Borrower in their own name.

(d) **Schedule 2.17(d)** lists all Commercial Tort Claims of the Borrower.

## III. AFFIRMATIVE COVENANTS OF THE BORROWER

The Borrower hereby covenants and agrees with each of the Lenders that from the date hereof and thereafter for so long as any portion of any Loan or other Obligation shall be outstanding, unless waived in writing by the Lenders:

**3.01. Notice of Defaults**. Promptly after the Borrower knows or has reason to know that any Default or Event of Default has occurred and is continuing, but in any event not later than one (1) Business Day after the Borrower becomes aware thereof, the Borrower shall provide the Lenders with notice of such Default or Event of Default describing the same in reasonable detail and a description of the action that the Borrower have taken and propose to take with respect thereto;

**3.02. Maintenance of Existence and Licenses; etc**. The Borrower shall maintain and preserve its existence, and qualification and good standing in all states and jurisdictions in which such qualification and good standing are required in order to conduct its business and own its property as conducted and owned in such states.

**3.03. Maintenance of Properties**. The Borrower will maintain or cause to be maintained in the ordinary course of business in good repair, working order and condition (reasonable wear and tear excepted) all property and assets material to and used in its business (whether owned or held under lease), and from time to time make or cause to be made all necessary or advisable repairs, renewals, replacements, additions, betterments and improvements thereto.

**3.04.  Compliance with Contracts; Payment of Liabilities**.  The Borrower will comply in all respects with the provisions of each agreement or contract to which the Borrower is a party. The Borrower shall pay, bond and discharge as the same may become due and payable, all Taxes, assessments and other governmental charges or levies against or on any of its properties or assets, in each case, prior to the date on which they become delinquent or penalties attach, as well as all other lawful claims of any kind which, if unpaid, might become a Lien upon any of its property or assets.

**3.05.  Compliance with Laws**.  The Borrower shall carry on its business activities in substantial compliance with all applicable federal, state, local and foreign Laws and all applicable rules, regulations and orders of all governmental bodies and offices having power to regulate or supervise its business activities, including all applicable environmental, pollution control, health and safety statutes, laws and regulations.  The Borrower shall maintain all rights, liens, permits, certificates of compliance or grants of authority necessary for the conduct of its business.

**3.06.  Books and Records; etc**. The Borrower shall maintain a system of accounting administered in accordance with GAAP and shall keep books and records reflecting all of its business affairs and transactions in accordance with GAAP.

**3.07.  Use of Proceeds**.  The proceeds of the Loan will be used by the Borrower solely to purchase the Preferred Units in accordance with the LLC Agreement.

**3.08.  Information**.  Borrower shall promptly furnish each Lender with such information and documentation within its possession as such Lender shall reasonably request from time to time with respect to the financial condition, properties, assets, liabilities and other matters related to Borrower, the LLC Agreement and the Collateral, including specifically the 777 Partners LLC and 600 Partners LLC quarterly financial statements.

**3.09.  OFAC; Patriot Act**.  The Borrower shall comply with the laws, regulations and executive orders referred to in **Section 2.14** and **Section 2.15**.

**3.10.  Further Assurances**.  Promptly upon reasonable request by any Lender, the Borrower shall take such additional actions and execute such documents as any Lender may reasonably request from time to time in order (i) to carry out the purposes of this Agreement, (ii) to subject to the Liens in the Collateral granted by this Agreement any of the Collateral and (iii) to perfect and maintain the validity, effectiveness and priority of the Liens granted by this Agreement and the Liens intended to be created thereby.  The Borrower authorizes the Lenders and the Security Agent to file any financing statement that describes the Collateral as "all assets" or "all personal property" of the Borrower, or words to similar effect, and ratifies any action taken by the Lenders or the Security Agent before the Closing Date to effect or perfect its Lien on any Collateral.

## IV. NEGATIVE COVENANTS OF THE BORROWER

The Borrower hereby covenants and agrees with each of the Lenders that from the date hereof and thereafter for so long as any portion of any Loan or other Obligation shall be outstanding, and without the written consent of all of the Lenders:

**4.01.  Limitation on Indebtedness**.  The Borrower shall not create, assume, incur, issue, guarantee or otherwise become or remain obligated in respect of, or permit to be outstanding, any Indebtedness, in each case, other than the Obligations.

**4.02. Liens**.  The Borrower shall not create, incur, assume or permit to exist or to be created or assumed any Lien on any of its property or assets, whether now owned or hereafter acquired, except for Liens in favor of the Security Agent, for the ratable benefit of the Lenders, to secure the Obligations.

**4.03. Sales of Assets**.  The Borrower shall not make any Asset Dispositions.

**4.04.  Liquidations, Mergers and Consolidations; Creation of Subsidiaries**.

(a) The Borrower shall not liquidate or dissolve itself (or suffer any liquidation or dissolution) or otherwise wind up, or consolidate with or merge into any other Person, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets.

(b) The Borrower shall not create, organize, form, establish, acquire, invest in or otherwise have, hold or own any Subsidiaries.

**4.05. Investments**.  The Borrower shall not make or permit to exist any Investment other than an Investment in the Preferred Units.

**4.06. Transactions with Affiliates**.  The Borrower shall not enter into any transaction (including the purchase, sale or exchange of property, the rendering of any service, the making of any Investment in an Affiliate or the repayment of any Indebtedness owed to an Affiliate) with an Affiliate.

**4.07. Amendment and Waiver**. The Borrower shall not enter into any amendment of, or agree to or accept or consent to any waiver of any of the provisions of its Organic Documents in a manner that could reasonably be expected to be adverse to the rights, interests or privileges of the Lenders or their ability to enforce this Agreement.  The Borrower shall not amend, modify, change, waive, or obtain any consent, waiver or forbearance with respect to, any of the terms or provisions of the LLC Agreement or any other agreement or contract to which the Borrower is a party.

**4.08. Restricted Payments**.  The Borrower shall not make any Restricted Payment.

**4.09. Change in Business**.

(a)    The Borrower shall not engage in any business other than (A) holding the Preferred Units, (B) complying with the requirements of applicable law, (C) maintaining its limited liability company existence, (D) maintaining books and records, and (E) de minimis activities incidental to the foregoing.

(b)    The Borrower shall not own, hold, lease, operate or have possession of any assets other than the Preferred Units and its rights under the LLC Agreement.

(c)    The Borrower shall not incur, create, assume or otherwise become liable for, any obligations, liabilities or indebtedness other than (A) obligations or liabilities under the this Agreement and the LLC Agreement, and (B) de minimis obligations in connection with its compliance with the requirements of applicable law and its maintenance of its limited liability company existence.

**4.11. Changes in Accounting, Name and Jurisdiction of Organization**.    The Borrower shall not (i) change its fiscal year, (ii) change its name as it appears in official filings in its jurisdiction of organization, (iii) make any change in its accounting treatment or reporting practices in a manner that could be reasonably anticipated to be prejudicial to the Lenders (other than changes required by GAAP) or (iv) change its jurisdiction or form of organization.

## V.  CONDITIONS OF THE LENDERS EXTENDING THE LOAN

The extension of the Loan by the Lenders hereunder shall be subject to the following conditions precedent:

**5.01. Representations.**    The representations and warranties of the Borrower set forth in **Article II** hereof shall be true and correct on and as of the date hereof.

**5.02. Material Adverse Change.**    There shall have been no material adverse change whatsoever, determined in the Lender's sole, reasonable discretion, with respect to the Borrower or any principal of the Borrower.

**5.03. Certification.**    The Borrower shall have executed and delivered to the Lenders such supporting documents as the Lenders may reasonably request.

**5.04. Legal Matters.**    All legal matters incident to the transactions hereby contemplated shall be satisfactory to counsel for the Lenders.

**5.05. No Default or Insolvency Event**.    No Default or Event of Default shall have occurred or be continuing and no Insolvency Event with respect to the Borrower shall exist.

**5.06. Minimum Preferred Subscription**.    At least $209 million in preferred equity interests of 777 Partners LLC and 600 Partners LLC in the aggregate must be committed or subscribed.

5.07  **Equity Contribution**.  Borrower shall obtain a $30 million cash equity contribution.

5.08  **Rating**.  Egan Jones shall rate the Loan as at least BBB-.

## VI.  DEFAULTS AND REMEDIES

6.01.  **Events of Default.**  The term "Event of Default" means any of the following events occurring for whatever reason, whether voluntary or involuntary, effected by operation of law, judgment, order or otherwise:

(a) any representation or warranty made herein, or in any report, certificate, financial statement or other instrument furnished in connection with this Agreement shall prove to be false or misleading in any respect on or as of the date made or deemed made;

(b) any default in the payment of any sums due hereunder after the date when the same shall become due or payable, whether at the due date thereof or at a date fixed by acceleration or otherwise;

(c) any default by the Borrower in the due performance and observance of any of the covenants or agreements contained in this Agreement;

(d) any Insolvency Event in respect of the Borrower;

(e) an order, judgment or decree shall be entered, without the application, approval or consent of any party by any court of competent jurisdiction, approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of any party or of all or a substantial part of the assets of the Borrower;

(f) the Borrower (i) fails to make any payment in respect of any instrument or agreement to which it is a party or by which it or any of its properties is bound relating to any Indebtedness (other than the Obligations), or (ii) defaults in the observance or performance of any other term, covenant, condition or agreement relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto;

(g) any final judgment or order for the payment of money is entered against the Borrower in an amount that remains unpaid for more than thirty (30) days;

(h) [reserved]

(i) this Agreement or any material provision of this Agreement shall at any time and for any reason cease to be valid and binding on or enforceable against the Borrower or the Borrower shall so state in writing or bring an action to limit its obligations or liabilities hereunder; or

(j) the Security Agent, for the ratable benefit of the Lenders, shall cease to have, for any reason, a valid and enforceable first-priority perfected security interest in any Collateral, or the validity or enforceability thereof shall be contested by the Borrower.

**6.02.  Acceleration.**  If an Event of Default described in **Section 6.01(d)** or **(e)** shall occur, to the extent permitted by law, the full unpaid principal amount of and interest on the Loan and all other amounts due and owing and Obligations hereunder shall automatically be due and payable without any declaration, notice, presentment, protest or demand of any kind (all of which are hereby waived).  If any Event of Default other than pursuant to **Section 6.01(d)** or **(e)** shall occur and be continuing, the Lenders, upon written notice to the Borrower, may declare the outstanding principal amount of and interest on the Loan and all other amounts due and owing and Obligations hereunder to be due and payable without other notice to the Borrower, presentment, protest or demand of any kind (all of which are hereby waived), whereupon the full unpaid amount of the Loan and any and all other Obligations, which shall be so declared due and payable shall bear interest at the Default Rate and shall be and become immediately due and payable.

**6.03.  Set-off.**  The Borrower hereby grants to each Lender the right at any time after the occurrence of an Event of Default to set off or otherwise apply by such Lender against the payment of all amounts owing by the Borrower in respect to this Agreement, in such order as it shall determine, all credits, accounts, claims and balances of whatever nature of the defaulting party at any time in the possession or control of or owing by such Lender or its agents (remittances and property to be deemed in possession of the such Lender as soon as put in transit to it) including, without limitation, any balances on deposit in any account of the defaulting party.  ANY AND ALL RIGHTS TO REQUIRE A LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF A DEFAULTING PARTY, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

**6.04.  Default Interest.**

(a) Upon the occurrence and during the continuation of any Event of Default, interest with respect to the then outstanding balance of the Loan, shall be calculated by using the Default Rate instead of the Interest Rate. Interest at the Default Rate shall accrue from the initial date of such Event of Default until all then effective Events of Default are waived (subject to clause (b) below) or ceases to continue, and shall be payable upon demand.

(b) Notwithstanding anything to the contrary contained herein and without limiting any of the rights and remedies of the Lenders under this Agreement, the Lenders may grant a waiver of any Event of Default in accordance with the terms of this Agreement while continuing to require the payment of interest at the Default Rate during the continuation of such Event of Default that was otherwise waived, as applicable.

**6.05.  Other Remedies.**  The parties shall always have the right to pursue any and all remedies, without prejudice to any other remedy or remedies which they may have at law or in

equity, such that any remedies may be pursued concurrently and/or consecutively, all shall be cumulative, and none shall be exclusive.

**6.06.  License.**  Each Lender and the Security Agent are hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of Borrower, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral.  The Borrower's rights and interests under Intellectual Property shall inure to the benefit of the Lenders and the Security Agent.

## VII.  MISCELLANEOUS

**7.01.  Survival of Representations**.  All of each party's representations and warranties made herein shall survive the repayment, satisfaction or discharge of all the Obligations and liabilities of the Borrower under the Agreement.

**7.02.  Successors and Assigns.**  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party; and all covenants, promises and agreements in this Agreement contained, by or on behalf of any party shall inure to the benefit of the respective successors and permitted assigns of the other party.  Each Lender may assign its rights and obligations hereunder to (x) an Affiliate of such Lender or (y) any other assignee approved by the Borrower (which approval shall not be unreasonably withheld or delayed, and shall be deemed given if no objection is made within five (5) Business Days after receipt of written notice of the proposed assignment); provided that no such approval shall be recurred if an Event of Default has occurred and is continuing.  The Borrower may not assign or transfer any of rights or obligations hereunder without the prior written consent of all of the Lenders.  Each Lender shall provide and the Borrower shall retain a copy of any document affecting any such assignment.  The Borrower shall maintain a register for the recordation of the names and addresses of each Lender and any assignee, the commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender or assignee pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Lender and its assignees shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

**7.03.  No Amendment or Waiver.**  No amendment, modification or waiver of any provision of this Agreement nor consent to any departure by the other therefrom, shall in any event be effective unless the same shall be in writing and executed by all of the Lenders, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  No notice to, or demand on, any party, in any case, shall entitle any party to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor delay on the part of any party in exercising any right, power or privilege hereunder, or any other instrument given as security herefore, shall operate as a waiver, nor shall a single or partial exercise

preclude any other or future exercise, or the exercise of any other right, power or privilege. After entry of any judgment against any party, the acceptance by the judgment holder of any payments by or on behalf of the party against whom judgment entered shall not cure or be deemed to cure any Event of Default or reinstate or be deemed to reinstate the terms hereof absent an express written agreement duly executed by both parties.

**7.04. Captions.** The captions and other headings contained in this Agreement are for reference only and shall not affect the meaning or interpretation of this Agreement.

**7.05. Notices.** All communications provided for hereunder shall be in writing, sent by reputable nationwide delivery service providing confirmation of delivery (such as FedEx or UPS) or electronic mail, addressed to the respective parties at the addresses set forth below; provided, however, electronic communications shall be deemed effective notice if, and only if, the receiving party expressly confirms receipt thereof. Each party by notice duly given in accordance herewith may specify a different address for the purposes hereof.

In the case of the Lenders, to the address specified for such Lender on Schedule A

In the case of the Borrower:

Noble Financial Solutions LLC
600 Brickell Ave., Suite 1900
Miami, FL 33131
Attn: Damien Alfalla
Email: dalfalla@777part.com
*As administrator for the Borrower*

**7.06. Severability.** Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

**7.07. Gender.** Words of the masculine gender shall mean and include correlative words of the feminine and neuter genders and words importing the singular number shall mean and include the plural number and vice versa.

**7.08. Arm's-Length Transaction.** The Borrower recognizes, stipulates, and agrees that each Lender's actions and relationships with the parties hereto, including, but not limited to, those relationships created or referenced by or in this Agreement, have been and constitute arm's-length commercial transactions and that such actions and relationships shall at all times in the future continue to constitute arm's-length commercial transactions and that such Lender shall not at any time act, be obligated to act, or otherwise be construed or interpreted as acting as or being the agent, attorney, partner, employee or fiduciary of any such parties.

**7.09. Negotiations.** The Borrower recognizes, stipulates and agrees that this Agreement is the product of and results from arm's-length negotiations between the parties and

that neither any Lender nor any other party has exerted or attempted to induce, through threats or otherwise, the execution or delivery of this Agreement. Without in any way limiting the foregoing, the Borrower stipulates and agrees that at all times during the course of the negotiations surrounding the execution and delivery of this Agreement, it has, to the extent deemed necessary or advisable in its sole discretion, been advised and assisted by competent counsel of its own choosing, that counsel has been present and actively participated in the negotiations surrounding this Agreement, and that it has been fully advised by counsel of its choosing of the effect of each term, condition, provision and stipulation contained herein and therein. Therefore, any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Agreement or any and all other documents executed in connection herewith or therewith.

7.10. **No Offer.** Neither the negotiations to date nor the preparation of this Agreement shall be deemed an offer by any of the parties to the other. No such instrument, document or agreement shall be deemed binding on any party until such party has executed and delivered the same in writing.

7.11. **Agreements Relating to Consideration.** The parties hereby acknowledge and agree that the covenants and agreements of the parties under this Agreement constitute full and fair consideration for the obligations, covenants and agreements of the parties under this Agreement and that, by virtue of such consideration, each of the parties hereto and thereto have received reasonably equivalent value in exchange for the covenants and agreements hereunder and thereunder.

7.12. **Integration.** This Agreement contains the entire agreement between the parties relating to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto. All exhibits and/or schedules attached hereto are incorporated herein by reference.

7.13. **Counterparts; Electronic Execution.**

(a)    This Agreement and the other Loan Documents may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any other Loan Document by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b) The words "execution," "signed," "signature," and words of like import in this Agreement and the other Loan Documents shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**7.14.** **Commercial Transaction.** The Borrower (a) acknowledges that the transaction of which this Agreement is a part is a commercial transaction and (b) to the extent permitted by any U.S. federal or state law, waives the right it may have to prior notice of and a hearing on the right of a party to any remedy or combination of remedies that enables the party, by way of attachment, foreign attachment, garnishment or replevin, to deprive the other party of any property, at any time, prior to final judgment in any litigation instituted in connection with this Agreement.

**7.15.** **Continuing Enforcement**. If, after receipt of any payment from a party, another party is compelled or agrees, for settlement purposes or otherwise, to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Agreement shall continue in full force and effect or be reinstated, as the case may be, and the party that originally made such payment shall be liable for, and shall indemnify, defend and hold harmless the other party with respect to, the full amount so surrendered. The provisions of this **Section 7.15** shall survive the cancellation or termination of this Agreement and shall remain effective notwithstanding the payment and performance of all obligations hereunder, the release of any security interest, lien or encumbrance securing same or any other action that a party may have taken in reliance upon its receipt of such payment. Any cancellation, release or other such action shall be deemed to have been conditioned upon any payment of the obligations evidenced hereby having become final and irrevocable.

**7.16.** **Limited Recourse.** Notwithstanding any other provision of this Agreement, no recourse under any obligation, covenant or agreement of the Borrower contained in this Agreement or any other Loan Document shall be had against any incorporator, stockholder, partner, officer, director, member, manager, employee or agent of the Borrower, Hudson Cove Capital Management LLC or any of their respective Affiliates (solely by virtue of such capacity) by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise; it being expressly agreed and understood that this Agreement and the other Loan Documents are solely corporate obligations of the Borrower and that no personal liability whatever shall attach to or be incurred by any incorporator, stockholder, partner, officer, director, member, manager, employee or agent of the Borrower, Hudson Cove Capital Management LLC or any of their respective Affiliates (solely by virtue of such capacity) or any of them under or by reason of any of the obligations, covenants or agreements of the Borrower contained in this Agreement or any other Loan Document, or implied therefrom, and that any and all personal liability for breaches by the Borrower of any of such obligations, covenants or agreements, either at common law or at equity, or by statute, rule or regulation, of every such incorporator, stockholder, partner, officer, director, member, manager, employee or agent is hereby expressly waived as a condition of and in consideration for the execution of this Agreement.

**7.17.** **Governing Law; Jurisdiction; Service of Process; Venue, etc.** THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, OR ANY OTHER LOAN DOCUMENT (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT

REGARD TO CONFLICT OF LAW PRINCIPLES. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE JURISDICTION OF COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN, OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF. IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO SUCH PERSON AT ITS ADDRESS SET FORTH IN **SECTION 7.05** HERETO. EACH PARTY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**7.18 <u>Waiver of Trial by Jury</u>.** THE PARTIES HERETO EACH WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT. ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. THE PARTIES HERETO EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS **SECTION 7.18** AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER SHALL APPLY TO ANY AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF,** the Borrower, the Security Agent and the Lenders have caused this Agreement to be duly executed effective as of the date of last execution by them appearing below.

**LENDER:**

SILAC INSURANCE COMPANY

By: _____
    Name: James S. Adams
    Title: CFO

**LENDER:**

SILAC INSURANCE COMPANY

By: _____
    Name:    Paul Stanworth
    Title:    Chief Investment Officer
             777 Asset Management
    *On behalf of SILAC Insurance Company*
    *pursuant to Investment Management Agreement*

**LENDER:**

HAYMARKET INSURANCE COMPANY

By: _____
    Name:
    Title:

**SECURITY AGENT:**

777 ASSET MANAGEMENT

By: _____
    Name:    Paul Stanworth
    Title:    Chief Investment Officer

**IN WITNESS WHEREOF,** the Borrower, the Security Agent and the Lenders have caused this Agreement to be duly executed effective as of the date of last execution by them appearing below.

**LENDER:**

SILAC INSURANCE COMPANY


By: _____
    Name:
    Title:

**LENDER:**

SILAC INSURANCE COMPANY

By: _____
    B8C23FF3B534402...
    Name:   Paul Stanworth
    Title:    Chief Investment Officer
              777 Asset Management
    *On behalf of SILAC Insurance Company*
    *pursuant to Investment Management Agreement*


**LENDER:**

HAYMARKET INSURANCE COMPANY

By: _____
    908D352F79AA4A0...
    Name:  Yuan Zhou
    Title:   CIO


**SECURITY AGENT:**

777 ASSET MANAGEMENT

By: _____
    B8C23FF3B534402...
    Name:   Paul Stanworth
    Title:    Chief Investment Officer

**BORROWER:**

NOBLE FINANCIAL SOLUTIONS LLC

By: _____
    Name:  Tori Boswick
    Title:   Manager

*Signature Page to Loan and Security Agreement (September 2021)*

39309013v3

Schedule A

|  | Lender | Dollar Allocation |
|---|---|---|
|  | SILAC Insurance Company<br>*(general account)*<br><br>SILAC Insurance Company<br>10201 N. Illinois St., Suite 280<br>Carmel, IN  46290<br>Attn: Scott Matthews<br>Email: scott.matthews@silacins.com | $25,000,000 |
|  | SILAC Insurance Company<br>*(ModCo account, pursuant to Investment Management Agreement with 777 Asset Management)*<br><br>777 Asset Management<br>600 Brickell Ave., Suite 1900<br>Miami, FL 33131<br>Attn:  Chris O'Reilly<br>coreilly@777part.com | $25,000,000 |
|  | Haymarket Insurance Company<br><br>Haymarket Insurance Company<br>415 Bedford Road, Suite 102<br>Pleasantville, NY 10570<br>Tel: 914-579-2929<br>Email: notices@acap.com<br>Email: cmcguffin@acap.com | $20,000,000 |
| **Total:** |  | **$70,000,000** |

Schedule 1.03

$25,000,000 from SILAC Insurance Company

$25,000,000 from SILAC Insurance Company (*ModCo account, pursuant to Investment Management Agreement with 777 Asset Management*)

$20,000,000 from Haymarket Insurance Company

To:

Account Name: 777 PARTNERS LLC

Financial Institution: First Republic Bank

Routing Number: 321081669

Account Number: 80009164965

As the administrative services provider for Borrower.

<u>Schedule 2.03</u>

**NOBLE FINANCIAL SOLUITIONS LLC**

| Name of Member | Equity Interests |
|---|---|
| Red Sea Consulting LLC | **Total: 100%** |

Schedule 2.17

(a)
- Jurisdiction of Organization:  Delaware
- Manager Executive Office:  1375 SW 82nd Ave., Miami, FL 33158
- Exact Legal Name:  Noble Financial Solutions LLC


(b)
- Deposit Accounts:  None.  777 Partners will administer Lender payments direct upon payment of the quarterly preferred interest payments.


(c)
- Intellectual Property:  None


(d)
- Tort Claims:  None

# EXHIBIT C

DocuSign Envelope ID: 6DDE34D5-1871-431E-B89B-3C4B999631BB



September 17, 2021

Josh Wander, Managing Partner
777 Partners, LLC
600 Brickell Ave, 19th floor
Miami, FL 33131


      Re:    *SILAC-777 Side Letter*

Dear Josh:

      This letter is being executed in connection with the Investment Management Agreement (the "Agreement") dated June 30, 2021, by and between 777 Asset Management LLC ("Manager") and SILAC Insurance Company (the "Company") and the Reinsurance Agreement effective June 30, 2021 between the Company and 777 Re Ltd.   Capitalized terms not defined herein shall have the meanings specified in the Agreements.

      Manager has asked the Company for permission to invest assets in the Account in senior debt issued by Noble Financial Solutions, LLC (the "Noble Senior Debt").  The proceeds from this investment are to be used to purchase $100mm of 777 Partners LLC's ("777 Partners") preferred equity ("777 Preferred Equity") in which the Company will have a first-priority, perfected security as a Lender.

      The Company is willing to make an exception Manager to invest $25mm in  Noble Senior Debt using assets held in the Account, and the Company agrees to make a separate investment of $25mm in Noble Senior Debt using its own assets not held in the Account ("SILAC Investment"), both investments subject to all of the following conditions being satisfied:

1.  777 Partners must raise a minimum of $209mm by the issuance of 777 Preferred Equity, (this amount includes the $50mm of investments contemplated herein).  As a condition of funding from the Account and the SILAC Investment, 777 Partners must provide confirmation of funding and sources and uses of funds.

2.  Noble must agree to pay interest on the Noble Senior Debt quarterly.

3.  Manager shall replace the Noble Senior Debt in the Account by no later than December 31, 2021.  The Company, in its sole discretion, may waive this deadline; provided however,

September 17, 2020
Page 2

if waived, the Company has the right to invoke the Noble Senior Debt be replaced at any time after December 31, 2021 upon thirty-days (30) notice.

4.  777 Partners agrees that at least $60,840,585.83 of the proceeds from the first closing of the 777 Preferred Equity offering shall go towards, directly or indirectly, the retirement of its debt to 777 Re. 777 Partners agrees to commit at least a combined [$35mm] to 777 Re from proceeds from the subsequent two closings on the 777 Preferred Equity scheduled for September 30, 2021 and October 15, 2021.

5.  Josh Wander will execute an unconditional personal guaranty in a form satisfactory to Company to guarantee payment of the SILAC Investment in the Noble Senior Debt held by SILAC. The Company shall have immediate recourse against Mr. Wander for any amount that is due and unpaid under the Noble Senior Debt and shall not be obligated to first seek recovery from Noble.

6.  The parties will execute an amendment to the Agreement, in a form satisfactory to Company, that prohibits Manager from investing in any similarly structured transactions in the future. Among other things, the amendment will clarify that "public securities" means investments that are a "publicly traded security" as defined under the Securities Exchange Act, and tighten the provisions of the Agreement dealing with affiliate investments, concentration limits and Manager's fiduciary obligations.

If these terms are acceptable, please sign and return to me.

Sincerely,

Stephen C. Hilbert

AGREED AND ACCEPTED BY:

Josh Wander, on his own behalf and on behalf 777 Partners, LLC

Paul Stanworth, 777 Asset Management LLC

September 17, 2020
Page 3

Will Rinehimer, 777 Re Ltd.

# EXHIBIT D

THIS PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION, AND MAY NOT BE OFFERED, SOLD, ENCUMBERED OR OTHERWISE TRANSFERRED, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SUCH STATE SECURITIES LAWS, OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

## PROMISSORY NOTE

**Amount: US $70,000,000**                                          **Date: September 20, 2021**

**FOR VALUE RECEIVED**, NOBLE FINANCIAL SOLUTIONS LLC ("**Maker**"), a Delaware limited liability company, promises to pay to SILAC INSURANCE COMPANY, a Utah insurance corporation, the principal sum of [XXXX MILLION AND 00/100 DOLLARS] ($XX,000,000.00), and HAYMARKET INSURANCE COMPANY, a Nebraska corporation, the principal sum of [XXXX MILLION AND 00/100 DOLLARS] ($XX,000,000.00) (each a "**Holder**" and collectively, the "**Holders**") in lawful money of the United States of America, together will all accrued interest thereon, as provided for in this Promissory Note (this "**Note**").

1.      Loan Agreement.  This Note is entered into as of even date with that certain Loan and Security Agreement, by and among Maker, the Security Agent, and Holders (as it may be amended from time to time) (the "**Loan Agreement**").  All terms not otherwise defined herein shall have the same meaning as in the Loan Agreement. In the event of a conflict between the terms of this Note and the Loan Agreement, the terms of this Note shall prevail.

2.      Interest Rate.  Interest on the outstanding principal balance of this Note shall be computed and calculated based upon a three hundred and sixty-five (365)-day year and actual days elapsed and shall accrue at the per annum rate equal to seven point eight five seven one four three percent (7.857143%) (the "**Interest Rate**"). The Interest Rate is set by Holders in their sole discretion and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Holders at any given time for any particular class of customers or credit extensions.

3.      Principal and Interest Payments.  Interest shall be due and payable on the final Business Day of each calendar quarter, in arrears, based upon the actual number of days elapsed for that month, commencing on September 20, 2021, and shall continue to be due and payable, in arrears, on the same day of each and every calendar month thereafter until the Maturity Date (as hereinafter defined). Principal outstanding hereunder with respect to each Advance under the Loan Agreement shall be due and payable the Maturity Date. Upon the Maturity Date, the entire unpaid obligation outstanding under this Note, the Loan Agreement and any other Loan Documents shall become due and payable in full. All payments due hereunder, including payments of principal and/or interest, shall be made to Holders in United States Dollars and shall be in the form of immediately available funds acceptable to the holder of this Note.

4.    Application of Payments. All payments received by Holders from, or for the account of Maker, due hereunder shall be applied by Holders, in their sole and absolute discretion, in the following manner, or in any other order or manner as Lender chooses: (1) to interest, (2) fees, and (3) principal.   All records of payments received by Holders shall be maintained at Holders' office, and the records of Holders shall, absent manifest error, be binding and conclusive upon Maker. The failure of Holders to record any payment or expense shall not limit or otherwise affect the obligations of Maker under this Note.

5. Maturity Date. On September 30, 2031 ("**Maturity Date**"), the entire unpaid principal balance of the Loan, and all unpaid accrued interest thereon, shall be due and payable without demand or notice, subject to acceleration as provided in this Note. In the event that Maker does not pay this Note in full on the Maturity Date then, as of the Maturity Date and thereafter until paid in full, the interest accruing on the outstanding principal balance hereunder shall be computed, calculated and accrued on a daily basis at the Default Rate (as hereinafter defined).

6. Unpaid Interest, Charges and Costs. Interest, late charges, costs or expenses that are not received by Holders within ten (10) calendar days from the date such interest, late charges, costs, or expenses become due, shall, at the sole discretion of Holders, be added to the principal balance and shall from the date due bear interest at the Default Rate.

7. Business Days. Whenever any payment to be made under this Note shall be due on a day other than a Business Day, then the due date for such payment shall be automatically extended to the next succeeding Business Day.

8. No Offsets or Deductions. All payments under this Note shall be made by Maker without any offset, decrease, reduction or deduction of any kind or nature whatsoever, including, but not limited to, any decrease, reduction or deduction for, or on account of, any offset, present or future taxes, present or future reserves, imposts or duties of any kind or nature, that are imposed or levied by or on behalf of any government or taxing agency, body or authority by or for any municipality, state or country. If at any time, present or future, Holders shall be compelled by any Law, rule, regulation or any other such requirement which on its face or by its application requires or establishes reserves, or payment, deduction or withholding of taxes, imposts or duties to act such that it causes or results in a decrease, reduction or deduction, (as described above) in payment received by Holders; then Maker shall pay to Holders such additional amounts, as Holders shall deem necessary and appropriate, such that every payment received under this Note, after such decrease, reserve, reduction, deduction, payment or required withholding, shall not be reduced in any manner whatsoever.

9. Default. An Event of Default under the Loan Agreement shall constitute a default under this Note (hereinafter "**Default**"). Upon the occurrence of a Default hereunder, Holders may, in their sole and absolute discretion, declare the entire unpaid principal balance, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder, immediately due and payable, without notice or demand.

10. <u>Waivers</u>. Maker and all others liable hereon hereby waive presentation for payment, demand, notice of dishonor, protest, and notice of protest, notice of intent to accelerate, and notice of acceleration, stay of execution and all other suretyship defenses to payment generally. No release of any security held for the payment of this Note, or extension of any time periods for any payments due hereunder, or release of collateral that may be granted by Lender from time to time, and no alteration, amendment or waiver of any provision of this Note or of any of the other Loan Documents, shall modify, waive, extend, change, discharge, terminate or affect the liability of Maker and any others that may at any time be liable for the payment of this Note or the performance of any covenants contained in any of the Loan Documents.

11. <u>Maximum Legal Rate</u>. This Note is subject to the express condition that at no time shall Maker be obligated, or required, to pay interest on the principal balance at a rate (i) which could subject Holders to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Holders is permitted to charge under applicable Law. If, by the terms of this Note, Maker is, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, or shall retroactively be deemed to have been payments made, in reduction of the principal balance, as the case may be.

12. <u>Amendment; Governing Law</u>. This Amended Note may be amended, changed, modified, terminated or canceled only by a written agreement signed by the party against whom enforcement is sought for any such action. All provisions in Article 7.17 of the Loan Agreement pertaining to governing law, jurisdiction, dispute resolution and waiver of sovereign immunity are incorporated by reference herein.

13. <u>Authority</u>. Maker, and each person executing this Note on Maker's behalf, hereby represents and warrants to Lender that, by its execution below, Maker has the full power, authority and legal right to execute and deliver this Note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Maker without exception or limitation.


[Signatures to Follow]

**IN WITNESS WHEREOF**, Maker has executed this Note on the day and year first above written.

**MAKER**:

By: _____

Name: Tor Boswick

Its: Principal

# EXHIBIT E



January 20, 2023

Noble Financial Solutions
600 Brickell Avenue, 19th Floor
Miami, Florida 33131
Attn: Damien Alfalla
Via Email: dalfalla@777part.com

Re: Noble Financial Solutions – Notice of Default

Damien:

This letter shall serve as notice to Noble Financial Solutions LLC (the "Borrower"), that the loan made pursuant to that certain Loan and Security Agreement dated September 21, 2021, with all subsequent amendments thereto (the "Loan Agreement"), is in default due to the failure to make the quarterly payment of $1,453,033.29 (the "Payment Amount") that was due to SILAC on December 30, 2022 (the "Date of Default").

In accordance with the Loan Agreement, the applicable interest rate has increased to 12.857143% as of the Date of Default (the "Default Interest"). Please immediately remit payment to SILAC of the Payment Amount plus the Default Interest from the Date of Default.

SILAC hereby retains all rights and remedies afforded to it under the Loan Agreement, including, but not limited to, declaring the entire amount immediately due and payable.

Thank you,

SILAC Insurance Company
By: James Adams, Vice Chairman of Finance

cc:     ghahn@winthropcm.com
        jhorrey@winthropcm.com

# EXHIBIT F



July 19, 2023

*Via Email: pasko@777part.com*

Steve Pasko
777 PARTNERS LLC
600 Brickell Ave., 19th Floor
Miami, Florida 33131

Re: Notice of Default – Noble Financial Solutions, LLC

Dear Mr. Pasko:

Please be advised that the debt issued by Noble Financial Solutions, LLC to SILAC Insurance Company (the "Noble Senior Debt") is currently in default with total accrued and default interest in the amount of Six Hundred Thirty-Five Thousand Six Hundred Sixteen Dollars and Forty-Five Cents ($635,616.45) due and owing SILAC.

On September 17, 2021, SILAC, 777 Partners, LLC, 777 Asset Management, LLC  and 777 Re Ltd. Entered into a letter agreement whereby the Parties agreed that SILAC's investment of $20,000,000 in the Noble Senior Debt would be replaced by no later than December 31, 2021. (See attached letter).  Despite SILAC's repeated requests that this debt be replaced, 777 Partners has repeatedly failed and refused to do so.  Pursuant to the letter agreement, SILAC may invoke its right to demand the replacement upon thirty-days notice.  This letter shall serve as SILAC's final demand that the Noble debt be replaced.

Further, in connection with the letter agreement, Josh Wander entered into an unconditional personal guaranty that guarantees the payment of the Noble Senior Debt. (See attached).  If this situation is not remedied, SILAC is prepared to take legal action against 777 Partners and Mr. Wander personally to secure performance of the obligations undertaken by each of them.

It is imperative that this situation is resolved immediately.  If we do not receive a satisfactory resolution to this issue, SILAC reserves all rights in has in law and equity to pursue 777 Partners and Mr. Wander, including filing a lawsuit seeking monetary damages and injunctive relief.  We look forward to your prompt and positive response.

Govern yourself accordingly.

Sincerely,

Scott D. Matthews
Chief Legal Officer

cc: Josh Wander via email - jwander@777part.com

DocuSign Envelope ID: 6DDE34DF-1071-431E-B88B-3C1B999531BB



September 17, 2021

Josh Wander, Managing Partner
777 Partners, LLC
600 Brickell Ave, 19th floor
Miami, FL 33131

      Re:    *SILAC-777 Side Letter*

Dear Josh:

      This letter is being executed in connection with the Investment Management Agreement (the "Agreement") dated June 30, 2021, by and between 777 Asset Management LLC ("Manager") and SILAC Insurance Company (the "Company") and the Reinsurance Agreement effective June 30, 2021 between the Company and 777 Re Ltd.   Capitalized terms not defined herein shall have the meanings specified in the Agreements.

      Manager has asked the Company for permission to invest assets in the Account in senior debt issued by Noble Financial Solutions, LLC (the "Noble Senior Debt").  The proceeds from this investment are to be used to purchase $100mm of 777 Partners LLC's ("777 Partners") preferred equity ("777 Preferred Equity") in which the Company will have a first-priority, perfected security as a Lender.

      The Company is willing to make an exception Manager to invest $25mm in  Noble Senior Debt using assets held in the Account, and the Company agrees to make a separate investment of $25mm in Noble Senior Debt using its own assets not held in the Account ("SILAC Investment"), both investments subject to all of the following conditions being satisfied:

1.   777 Partners must raise a minimum of $209mm by the issuance of 777 Preferred Equity, (this amount includes the $50mm of investments contemplated herein).  As a condition of funding from the Account and the SILAC Investment, 777 Partners must provide confirmation of funding and sources and uses of funds.

2.   Noble must agree to pay interest on the Noble Senior Debt quarterly.

3.   Manager shall replace the Noble Senior Debt in the Account by no later than December 31, 2021.  The Company, in its sole discretion, may waive this deadline; provided however,

---

DocuSign Envelope ID: 6DDE34DF-1071-431E-B88B-3C1B999531BB

September 17, 2020
Page 2

if waived, the Company has the right to invoke the Noble Senior Debt be replaced at any time after December 31, 2021 upon thirty-days (30) notice.

4.  777 Partners agrees that at least $60,840,585.83 of the proceeds from the first closing of the 777 Preferred Equity offering shall go towards, directly or indirectly, the retirement of its debt to 777 Re. 777 Partners agrees to commit at least a combined [$35mm] to 777 Re from proceeds from the subsequent two closings on the 777 Preferred Equity scheduled for September 30, 2021 and October 15, 2021.

5.  Josh Wander will execute an unconditional personal guaranty in a form satisfactory to Company to guarantee payment of the SILAC Investment in the Noble Senior Debt held by SILAC. The Company shall have immediate recourse against Mr. Wander for any amount that is due and unpaid under the Noble Senior Debt and shall not be obligated to first seek recovery from Noble.

6.  The parties will execute an amendment to the Agreement, in a form satisfactory to Company, that prohibits Manager from investing in any similarly structured transactions in the future. Among other things, the amendment will clarify that "public securities" means investments that are a "publicly traded security" as defined under the Securities Exchange Act, and tighten the provisions of the Agreement dealing with affiliate investments, concentration limits and Manager's fiduciary obligations.

If these terms are acceptable, please sign and return to me.

Sincerely,

Stephen C. Hilbert

AGREED AND ACCEPTED BY:

Josh Wander, on his own behalf and on behalf 777 Partners, LLC

Paul Stanworth, 777 Asset Management LLC

DocuSign Envelope ID: 6DDE34DF-1071-431E-B88B-3C1B999531BB

September 17, 2020
Page 3

DocuSigned by:

_B421D1A49393409_

Will Rinehimer, 777 Re Ltd.

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

## GUARANTY

September 20, 2021

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, and in consideration of credit given, being given and to be given, and of other financial accommodations afforded or to be afforded by SILAC INSURANCE COMPANY, a Utah-domiciled life insurance company ("**Lender**"), to NOBLE FINANCIAL SOLUTIONS, LLC, a Delaware limited liability company ("**Debtor**"), the undersigned, JOSH WANDER ("**Guarantor**"), hereby unconditionally guarantees the full and prompt payment when due of the Guaranty Obligations (as defined herein), together with all costs, attorneys' fees and expenses paid or incurred by Lender in endeavoring to collect the Guaranty Obligations, including without limitation in the enforcement of this Guaranty.

This Guaranty is an absolute and unconditional guaranty of the payment of the Guaranty Obligations, and shall continue and be in full force and effect until all of the Guaranty Obligations shall be fully paid and no further Guaranty Obligations may thereafter arise. Certain other Persons may guarantee payment of all or part of the Guaranty Obligations (such Persons being referred to herein collectively as the "**Other Guarantors**"). Guarantor acknowledges and agrees that Guarantor's liability with respect to the Guaranty Obligations shall not be diminished, discharged, released or otherwise affected in any way in the event any of the Other Guarantors fails to execute a guaranty of all or any part of the Guaranty Obligations, fails to be bound thereby, fails to perform thereunder or in the event that such guaranty shall be invalid or unenforceable in whole or in part for any reason.

Guarantor expressly waives presentment for payment, demand, notice of demand and of dishonor and nonpayment of the Guaranty Obligations, protest and notice of protest, diligence in collecting and in the bringing of suit against any other Person, and Lender shall be under no obligation to notify Guarantor of its acceptance of this Guaranty or of any advances made or credit extended on the faith hereof or the failure of Debtor to pay any of the Guaranty Obligations as they mature, or to use diligence in preserving the liability of any Person (including, without limitation, Debtor) on the Guaranty Obligations or in bringing suit to enforce collection of the Guaranty Obligations. To the full extent allowed by applicable law, Guarantor waives all defenses given to sureties or guarantors at law or in equity other than the actual payment of the Guaranty Obligations and waives, to the full extent allowed by applicable law, all defenses based upon questions as to the validity, legality or enforceability of the Guaranty Obligations.

Lender, without authorization from or notice to Guarantor and without impairing or affecting the liability of Guarantor hereunder, may from time to time at its reasonable discretion and with or without valuable consideration, alter, compromise, accelerate, extend or change the time or manner for the payment of any or all of the Guaranty Obligations owed to it, extend additional loans, credit and financial accommodations and otherwise create additional Guaranty Obligations, increase or reduce the rate of interest thereon, take and surrender security, exchange collateral by way of substitution, or in any way it deems necessary take, accept, withdraw, subordinate, alter, amend, modify or eliminate collateral, add or release or discharge endorsers, guarantors or other obligors (including, without limitation, Debtor) make changes of any sort whatever in the terms of payment of the Guaranty Obligations owed to it or of doing business with Debtor, settle or compromise with Debtor or any other Person or Persons liable on the Guaranty Obligations owed to it (including, without limitation, Debtor) and direct the order or manner of sale of any security or collateral, all on such terms at it may see fit, and may apply all moneys received from Debtor or others, or from any security or collateral held by it (whether held under a security instrument or not) in such manner upon the Guaranty Obligations owed to it (whether then due or not) as it may determine to be in its best interest, without in any way being required to marshal securities or assets or to apply all or any part of such moneys upon any particular part of the Guaranty Obligations. It is specifically agreed that Lender is not required to retain, hold, protect, exercise due care with respect

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

thereto, or perfect security interests in or otherwise assure or safeguard any collateral or security for the Guaranty Obligations. No exercise or nonexercise by Lender of any right or remedy of Lender shall in any way affect any of Guarantor's obligations hereunder or any security furnished by Guarantor or give Guarantor any recourse against Lender.

The liability of Guarantor hereunder shall continue notwithstanding the incapacity, death, disability, dissolution or termination of any other Person or Persons (including, without limitation, Debtor). Neither (i) the failure of Lender to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of Debtor or of any other Person, (ii) the disallowance or avoidance under the Federal Bankruptcy Code (11 U.S.C. § 101 et seq., as amended) (the "**Bankruptcy Code**") of all or any portion of Lender's claims for repayment of the Guaranty Obligations or any security for the Guaranty Obligations, (iii) the use of cash or non-cash collateral under Section 363 of the Bankruptcy Code or any financing, extension of credit by Lender or grant of security interest to Lender under Section 364 of the Bankruptcy Code, nor (iv) any election of Lender in a proceeding instituted under the Bankruptcy Code, including without limitation any election of the application of Section 1111(b)(2) of the Bankruptcy Code, shall affect the liability of Guarantor hereunder; nor shall Guarantor be released from liability if recovery from Debtor or any other Person becomes barred by any statute of limitations or is otherwise restricted or prevented.

Lender shall not be required to pursue any other remedies before invoking the benefits of the guaranty of payment contained herein, and specifically it shall not be required to exhaust its remedies against Debtor or any surety or guarantor other than Guarantor or to proceed against any security now or hereafter existing for the payment of any of the Guaranty Obligations. Lender may maintain an action on this Guaranty, whether or not Debtor is joined therein or separate action is brought against Debtor.

Guarantor absolutely and unconditionally covenants and agrees that in the event Debtor defaults in payment of the Guaranty Obligations, or any part thereof, for any reason, when such becomes due, either by its terms or as the result of the exercise of any power to accelerate, Guarantor on demand and without further notice of dishonor and without any notice with respect to any matter or occurrence having been given to Guarantor previous to such demand, shall pay the Guaranty Obligations.

Guarantor further agrees that to the extent Debtor, Guarantor or any other Person makes a payment or transfers an interest in any property to Lender or the Lender enforces any security interest or lien or exercises any rights of set-off, and such payment or transfer or proceeds of such enforcement or set-off, or any portion thereof, are subsequently invalidated, declared to be fraudulent or preferential, or otherwise is avoided, and/or required to be repaid to Debtor, Debtor's estate, a trustee, receiver or any other Person under the Bankruptcy Code or any other bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such avoidance or repayment, the Guaranty Obligations or part thereof intended to be satisfied shall be revived and this Guaranty shall continue to be effective or shall be reinstated, as the case may be, and continued in full force and effect as if said payment or transfer had not been made or such enforcement or set-off had not occurred.

The payment by Guarantor of any amount pursuant to this Guaranty shall not in any way entitle Guarantor to any right, title or interest (whether by way of subrogation or otherwise) in and to any of the Guaranty Obligations or any proceeds thereof, or any security therefor. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS GUARANTY OR THE NOTE, SO LONG AS THE GUARANTY OBLIGATIONS ARE OUTSTANDING, GUARANTOR HEREBY UNCONDITIONALLY AGREES NOT TO ASSERT: (1) ANY CLAIM OR OTHER RIGHT, NOW EXISTING OR HEREAFTER ARISING, AGAINST DEBTOR OR ANY OTHER PERSON PRIMARILY OR CONTINGENTLY LIABLE FOR ALL OR ANY PART OF THE GUARANTY OBLIGATIONS, WHICH ARISES FROM OR BY VIRTUE OF THE EXISTENCE OR

2

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

PERFORMANCE OF THIS GUARANTY, INCLUDING, WITHOUT LIMITATION:  (A) ANY RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR OTHER RIGHT TO PAYMENT, WHETHER OR NOT SUCH RIGHT IS REDUCED TO JUDGMENT, LIQUIDATED, UNLIQUIDATED, FIXED, CONTINGENT, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED; OR (B) ANY RIGHT TO AN EQUITABLE REMEDY FOR BREACH OF PERFORMANCE IF SUCH BREACH GIVES RISE TO A RIGHT TO PAYMENT, WHETHER OR NOT SUCH RIGHT TO AN EQUITABLE REMEDY IS REDUCED TO A JUDGMENT, FIXED, CONTINGENT, MATURED, UNMATURED, DISPUTED, UNDISPUTED, SECURED OR UNSECURED; AND (2) ANY RIGHT TO PARTICIPATE OR SHARE IN ANY RIGHT, REMEDY OR CLAIM OF LENDER AGAINST ANY OF DEBTOR'S INCOME OR ASSETS OR WITH RESPECT TO ANY COLLATERAL OR OTHER SECURITY FOR ALL OR ANY PART OF THE GUARANTY OBLIGATIONS OR ANY OTHER RIGHT OR CLAIM OF LENDER OF RECOURSE TO AND WITH RESPECT TO ANY ASSETS, INCOME OR PROPERTIES OF DEBTOR.

Guarantor represents and warrants to Lender that (i) Guarantor has a direct or indirect financial interest in Debtor and will benefit directly from the extension by Lender to Debtor of the loan facilities described in the Note; (ii) Guarantor is Solvent (as hereinafter defined); (iii) the execution and delivery of this Guaranty by Guarantor was not undertaken by Guarantor with the "intent to hinder, delay, or defraud" (within the meaning of Ind. Code § 32-18-2-14 and §548(a)(1) of the Bankruptcy Code) creditors or any other Persons; (iv) that neither this Guaranty nor the payment or performance by Guarantor of Guarantor's obligations arising under or pursuant to this Guaranty do or are intended to render Guarantor insolvent, undercapitalized or in a condition of financial stringency; (v) this Guaranty is a legal, valid and binding obligation of Guarantor, enforceable in accordance with its terms; and (vi) the execution of this Guaranty by Guarantor and Guarantor's performance of all of its obligations hereunder have been duly authorized by all necessary organizational action.  If at any time any portion of the obligations of Guarantor under this Guaranty shall be determined by a court of competent jurisdiction to be invalid, unenforceable or avoidable, the remaining portion of the Guaranty Obligations under this Guaranty shall not in any way be affected, impaired, prejudiced or disturbed thereby and shall remain valid and enforceable to the full extent permitted by applicable law.  Notwithstanding anything in this Guaranty to the contrary, the liability of Guarantor hereunder shall be limited to the maximum amount which would not result in any one of the following conditions:

     a.    this Guaranty would constitute a fraudulent transfer within the meaning of § 548(a) of the Bankruptcy Code;

     b.    this Guaranty would constitute a fraudulent transfer within the meaning of Ind. Code § 32-18-2-1, et seq.; or

     c.    this Guaranty would constitute a fraudulent conveyance or fraudulent transfer within the meaning of any other applicable Federal or state bankruptcy, insolvency or other similar law or judicial decision.

All principal of and interest on any and all indebtedness, liabilities and obligations of Debtor to Guarantor (the "**Subordinated Debt**"), whether direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, now existing or hereafter arising, due or to become due to Guarantor, or held or to be held by Guarantor, whether created directly or acquired by assignment or otherwise, and whether evidenced by a written instrument or not, shall be expressly subordinated to the Guaranty Obligations.  Guarantor agrees not to receive or accept any payment of the Subordinated Debt and, in the event Guarantor receives any payment on the Subordinated Debt in violation of the foregoing,

US.134619708.02

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

Guarantor will hold any such payment in trust for Lender and forthwith turn it over to Lender, in the form received, to be applied to the Guaranty Obligations.

The rights of Lender are cumulative and shall not be exhausted by its exercise of any of its rights under this Guaranty or otherwise against Guarantor or by any number of successive actions until and unless each and all of the obligations of Guarantor under this Guaranty have been fully performed, satisfied and discharged.

Capitalized terms used herein but not defined shall have the meaning assigned thereto in the Note. Additionally, when used in this Guaranty:

(a)    "**Guaranty**" means this Guaranty, as the same may be amended and/or restated from time to time and at any time.

(b)    "**Guaranty Obligations**" means, collectively: (1) all obligations, liabilities and indebtedness of Debtor to Lender, now existing or hereafter arising, including the obligations evidenced by the Note, together with all interest accruing thereon, and all fees, charges and other amounts payable thereunder, whether such indebtedness, obligations and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several or joint and several; and (2) all extensions, renewals, amendments, restatements or replacements of the foregoing, together with all costs, expenses and reasonable attorneys' fees paid or incurred by Lender in the enforcement or collection of any of the foregoing or this Guaranty.

(c)    "**Note**" means that certain Promissory Note, dated as of even date herewith, executed by Debtor in favor of Lender, in the original principal amount of $25,000,000, as the same may hereafter be amended, modified or restated from time to time and at any time.

(d)    "**Person**" means an individual, a corporation, a limited or general partnership, a limited liability company, a joint venture, a trust or unincorporated organization, a joint stock company or other similar organization, or any other legal entity, whether acting in an individual, fiduciary or other capacity.

(e)    "**Solvent**" means with respect to any Person, that (i) the fair value of the assets of such Person at a fair valuation, will exceed the debts and liabilities, subordinated, contingent or otherwise, of such Person; (ii) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of such Person on such Person's debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) such Person will be able to pay such his/her/its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) such Person will have sufficient capital with which to conduct the businesses in which such Person is engaged as such businesses are now conducted and are proposed to be conducted after the date hereof.

This Guaranty shall be deemed to have been made under and shall be governed by the laws of the State of Indiana in all respects and shall not be waived, altered, modified or amended as to any of its terms or provisions except in writing duly signed by Lender and Guarantor. This Guaranty shall bind Guarantor and Guarantor's successors, assigns and legal representatives, and shall inure to the benefit of all transferees, credit participants, assignees, successors and endorsees of Lender. The failure of any Person to execute or be bound by this Guaranty shall not release or affect the liability of Guarantor, and the liability of Guarantor under this Guaranty is not conditioned or contingent upon or subject in any way

4

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

to obtaining or retaining the primary or secondary liability of any other Person with respect to all or any part of the Guaranty Obligations (including, without limitation, Debtor and the Other Guarantors).

Any notice given under or with respect to this Guaranty to Guarantor or Lender shall be in writing and, if delivered by hand or sent by overnight courier service, shall be deemed to have been given when delivered and, if mailed, shall be deemed to have been given five (5) days after the date when sent by registered or certified mail, postage prepaid, and, if to Guarantor addressed to Guarantor at the address of the Guarantor set forth on the signature page to this Guaranty, or, if to Lender, at Lender's address for notices set forth in the Note, or at such other address as either of Guarantor or Lender may, by written notice to the other, have designated as its address for such purpose.

Lender is relying and is entitled to rely upon each and all of the provisions of this Guaranty; and accordingly, if any provision or provisions of this Guaranty should be held to be invalid or ineffective, then all other provisions shall continue in full force and effect.

**GUARANTOR AND LENDER (BY ITS ACCEPTANCE OF THIS GUARANTY) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG GUARANTOR AND LENDER ARISING IN ANY WAY OUT OF OR WHICH IN ANY WAY INVOLVES ANY OF THE RIGHTS, OBLIGATIONS OR REMEDIES OF ANY PARTY TO THIS GUARANTY OR ANY DOCUMENT EXECUTED OR DELIVERED PURSUANT TO OR OTHERWISE IN CONNECTION WITH THIS GUARANTY OR THE NOTE, OR ANY RELATIONSHIP BETWEEN GUARANTOR AND LENDER.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED IN THE NOTE.  NEITHER GUARANTOR NOR LENDER WILL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN OR CANNOT BE WAIVED.**

**GUARANTOR AGREES THAT THE STATE AND FEDERAL COURTS LOCATED IN, OR WITH JURISDICTION WHICH INCLUDES HAMILTON COUNTY, INDIANA, HAVE NON-EXCLUSIVE JURISDICTION OVER ANY AND ALL ACTIONS AND PROCEEDINGS INVOLVING THIS GUARANTY OR ANY OTHER AGREEMENT MADE IN CONNECTION HEREWITH AND GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES TO SUBMIT TO THE JURISDICTION OF SUCH COURTS FOR PURPOSES OF ANY SUCH ACTION OR PROCEEDING. GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION THAT GUARANTOR MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING, INCLUDING ANY CLAIM THAT SUCH COURT IS AN INCONVENIENT FORUM, AND CONSENTS TO SERVICE OF PROCESS PROVIDED THE SAME IS IN ACCORDANCE WITH THE TERMS HEREOF. FINAL JUDGMENT IN ANY SUCH PROCEEDING AFTER ALL APPEALS HAVE BEEN EXHAUSTED OR WAIVED SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT.  NOTHING IN THIS GUARANTY SHALL AFFECT ANY RIGHT THAT LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTY AGAINST GUARANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.**

*[Signature page follows]*

DocuSign Envelope ID: E1C679D8-D449-4B2B-9FCB-47608B92105B

Executed and delivered to Lender effective as of the date first set forth above.

_____
Josh Wander

Address of Notices:

_____

_____

US.134619708.02

# EXHIBIT G

## ASSIGNMENT AND ACCEPTANCE

Reference is made to the Loan and Security Agreement dated as of September 20, 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "**Credit Agreement**"), among Noble Financial Solutions LLC, a Delaware limited liability company as Borrower (the "**Borrower**"), 777 Asset Management LLC, as Security Agent (the "**Security Agent**") and the lenders party thereto from time to time (collectively, the "**Lenders**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement.

SILAC Insurance Company (General account), an Indiana corporation ("**Assignor**") and Dacian Master Fund LP, a Delaware Limited Partnership ("**Assignee**"), agree as follows:

1.    Assignor hereby irrevocably sells and assigns to Assignee and Assignee hereby purchases and assumes from Assignor, (i) Assignor's rights and obligations in its capacity as Lender under the Credit Agreement and any other documents or instruments delivered thereto (collectively, the "**Loan Documents**") to the extent related to the principal amount of $20,000,000.00 of the Loan extended under the Credit Agreement (including without limitation any guarantees, security or collateral issued pursuant thereto) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender against any person or entity whether known or unknown, arising under or in connection with the Loan Documents or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the foregoing items (i) and (ii) being referred to, collectively, the "**Assigned Interest**").  This Assignment and Acceptance shall be effective as of January 1, 2024 (the "**Effective Date**").  From and after the Effective Date, Assignee hereby expressly assumes, and undertakes to perform, all of Assignor's obligations in respect of the Assigned Interest, and all principal, interest, fees and other amounts which would otherwise be payable to or for Assignor's account in respect of the Assigned Interest shall be payable to or for Assignee's account, to the extent such amounts accrue on or after the Effective Date.

2.    Assignor (i) represents and warrants that (a) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby, and (b) as of the date hereof, prior to giving effect to this Assignment and Acceptance, the outstanding balance of its Loans is $20,000,000.00; and (ii) makes no representation or warranty and assumes no responsibility (a) with respect to any statements, warranties or representations made in or in connection with the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents, other than that Assignor is the legal and beneficial owner of the Assigned Interest being assigned by it hereunder and that the Assigned Interest is free and clear of any adverse claim, and (b) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance by the Borrower of its obligations under the Loan Documents.

3.       Assignee (i) represents and warrants that (a) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (b) it is legally authorized to enter into this Assignment and Acceptance; (c) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and confirms that it has received copies of the Credit Agreement and the other Loan Documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it shall, independently and without reliance upon Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (iii) acknowledges that Assignor will retain the right to vote with respect to any proposed amendments, consents or waivers (collectively, "**Acts**") affecting the Assigned Interest and covenants to timely notify Assignor of any such Acts and to take action with respect to such Acts in accordance with the written (which can include email) instructions provided by Assignor with respect thereto; (iv) appoints and authorizes the Security Agent to take such action as agent on its behalf and to exercise such powers with respect to the Collateral as are delegated by the terms thereof; and (v) agrees that it will observe and perform all obligations that are required to be performed by it as a "Lender" under the Loan Documents.

4.       Assignee acknowledges and agrees that it will not sell or otherwise dispose of the Assigned Interest or any portion thereof, or grant any participation therein, in a manner which, or take any action in connection therewith which, would violate the terms of any Loan Documents.

5.       This Assignment and Acceptance and all rights and obligations shall be interpreted in accordance with and governed by the laws of the State of New York.  If any provision hereof would be invalid under applicable law, then such provision shall be deemed to be modified to the extent necessary to render it valid while most nearly preserving its original intent; no provision hereof shall be affected by another provision's being held invalid.

6.       Assignor agrees to: (i) direct Borrower to cause all future payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) from and after the Effective Date to be paid by wire transfer of immediately available United States dollars to Assignee's wire instructions to be provided under separate cover, (ii) direct the Security Agent to register the Assignee as holder of the Collateral to the extent of the Assigned Interests, and (iii) notify the Borrower of the assignment hereunder.

7.       All notices to be sent to Assignee shall be sent in the manner required by the Credit Agreement to Assignee's address for notices set forth on its signature page hereto.

8.       This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

IN WITNESS WHEREOF, this Assignment and Acceptance is executed as of June <u>4</u>, 2024.

**ASSIGNOR**:

**SILAC INSURANCE COMPANY** (General account),

By: _____
    Name:
    Title:

**ASSIGNEE**:

**DACIAN MASTER FUND LP**

By: Dacian GP LLC, its general partner

By: SILAC Insurance Company, its sole member

By: _____
    Name: Scott Matthews
    Title: General Counsel

**Address for Notices**:

with a copy to:

Dacian GP LLC – a Delaware limited liability company
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

with a copy to:

Winthrop Capital Management
10201 N Illinois Street, Suite 275
Carmel, IN 46290
Attn: Greg Hahn

*Signature Page to Assignment*
*and Acceptance*
*(Noble Financial Solutions)*

Filed: 6/19/2024 1:23 PM
Clerk
Hamilton County, Indiana
Hamilton Superior Court 3

# EXHIBIT H

## ASSIGNMENT AND ACCEPTANCE

Reference is made to the Loan and Security Agreement dated as of September 20, 2021 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "**Credit Agreement**"), among Noble Financial Solutions LLC, a Delaware limited liability company as Borrower (the "**Borrower**"), 777 Asset Management LLC, as Security Agent (the "**Security Agent**") and the lenders party thereto from time to time (collectively, the "**Lenders**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement.

SILAC Insurance Company (ModCo account), an Indiana corporation ("**Assignor**") and Dacian Master Fund LP, a Delaware Limited Partnership ("**Assignee**"), agree as follows:

1.      Assignor hereby irrevocably sells and assigns to Assignee and Assignee hereby purchases and assumes from Assignor, (i) Assignor's rights and obligations in its capacity as Lender under the Credit Agreement and any other documents or instruments delivered thereto (collectively, the "**Loan Documents**") to the extent related to the principal amount of $25,000,000.00 of the Loan extended under the Credit Agreement (including without limitation any guarantees, security or collateral issued pursuant thereto) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender against any person or entity whether known or unknown, arising under or in connection with the Loan Documents or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the foregoing items (i) and (ii) being referred to, collectively, the "**Assigned Interest**"). This Assignment and Acceptance shall be effective as of January 1, 2024 (the "**Effective Date**"). From and after the Effective Date, Assignee hereby expressly assumes, and undertakes to perform, all of Assignor's obligations in respect of the Assigned Interest, and all principal, interest, fees and other amounts which would otherwise be payable to or for Assignor's account in respect of the Assigned Interest shall be payable to or for Assignee's account, to the extent such amounts accrue on or after the Effective Date.

2.      Assignor (i) represents and warrants that (a) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby, and (b) as of the date hereof, prior to giving effect to this Assignment and Acceptance, the outstanding balance of its Loans is $25,000,000.00; and (ii) makes no representation or warranty and assumes no responsibility (a) with respect to any statements, warranties or representations made in or in connection with the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents, other than that Assignor is the legal and beneficial owner of the Assigned Interest being assigned by it hereunder and that the Assigned Interest is free and clear of any adverse claim, and (b) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance by the Borrower of its obligations under the Loan Documents.

3.      Assignee (i) represents and warrants that (a) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (b) it is legally authorized to enter into this Assignment and Acceptance; (c) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and confirms that it has received copies of the Credit Agreement and the other Loan Documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it shall, independently and without reliance upon Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (iii) acknowledges that Assignor will retain the right to vote with respect to any proposed amendments, consents or waivers (collectively, "**Acts**") affecting the Assigned Interest and covenants to timely notify Assignor of any such Acts and to take action with respect to such Acts in accordance with the written (which can include email) instructions provided by Assignor with respect thereto; (iv) appoints and authorizes the Security Agent to take such action as agent on its behalf and to exercise such powers with respect to the Collateral as are delegated by the terms thereof; and (v) agrees that it will observe and perform all obligations that are required to be performed by it as a "Lender" under the Loan Documents.

4.      Assignee acknowledges and agrees that it will not sell or otherwise dispose of the Assigned Interest or any portion thereof, or grant any participation therein, in a manner which, or take any action in connection therewith which, would violate the terms of any Loan Documents.

5.      This Assignment and Acceptance and all rights and obligations shall be interpreted in accordance with and governed by the laws of the State of New York.  If any provision hereof would be invalid under applicable law, then such provision shall be deemed to be modified to the extent necessary to render it valid while most nearly preserving its original intent; no provision hereof shall be affected by another provision's being held invalid.

6.      Assignor agrees to: (i) direct Borrower to cause all future payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) from and after the Effective Date to be paid by wire transfer of immediately available United States dollars to Assignee's wire instructions to be provided under separate cover, (iii) notify the Borrower of the Assignment hereunder, and (iii) direct the Security Agent to register the Assignee as holder of the Collateral to the extent of the Assigned Interests.

7.      All notices to be sent to Assignee shall be sent in the manner required by the Credit Agreement to Assignee's address for notices set forth on its signature page hereto.

8.      This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

IN WITNESS WHEREOF, this Assignment and Acceptance is executed as of June  4 , 2024.

**ASSIGNOR**:

**SILAC INSURANCE COMPANY** (ModCo account),

By: _____
    Name:
    Title:

**ASSIGNEE**:

**DACIAN MASTER FUND LP**

By: Dacian GP LLC, its general partner

By: SILAC Insurance Company, its sole member

By: _____
    Name: Scott Mathews
    Title: General Counsel

**Address for Notices**:

with a copy to:

Dacian GP LLC – a Delaware limited liability company
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

with a copy to:

Winthrop Capital Management
10201 N Illinois Street, Suite 275
Carmel, IN 46290
Attn:  Greg Hahn

# SUMMONS

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE HAMILTON SUPERIOR COURT NO. 3 |
| | ) SS: | |
| COUNTY OF HAMILTON | ) | CAUSE NO. 29D03-2406-PL-_____ |

| | |
|---|---|
| DACIAN MASTER FUND LP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JOSH WANDER, | ) |
| | ) |
| Defendant. | ) |

**To:** **Josh Wander**
**1413 20th Street**
**Apt. 212**
**Miami Beach, FL 33139-1485**

You are hereby notified that you have been sued by the entity named as Plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint, which is attached to this Summons. It also states the relief sought or the demand made against you by Plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by Plaintiff.

If you have a claim for relief against Plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

If you need the name of an attorney, you may contact your state or city bar association.

Dated ___6/19/2024_____ _Kathy Kreag Williams_ (Seal)

CLERK, HAMILTON CIRCUIT/SUPERIOR COURT

Michael N. Red
RED LAW GROUP LLC
P.O. Box 7848
Greenwood, IN 46142
Cell: (317) 908-9172

Clerk
Hamilton Circuit/Superior Court
1 Hamilton County Square
Suite 106
Noblesville, IN 46060
Phone: (317) 776-9629

**The following manner of service of summons is hereby designated.**

      X          Registered or certified mail.

                  Service at place of employment, to-wit:

                  Service on individual – (Personal or copy) at above address.

                  Service on agent. (Specify) _____

                  Other service. (Specify) _____

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the _____ day of _____ 20___:

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant, _____ _____ .

(2) By leaving a copy of the Summons and a copy of the complaint at _____ which is the dwelling place or usual place of abode of _____ and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks: _____ _____

_____          _____
SHERIFF'S COST                                                              SHERIFF

By:_____
DEPUTY

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 20____, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____,          by _____ mail, requesting a return receipt, at the address furnished by Plaintiffs.

_____
CLERK, HAMILTON CIRCUIT/SUPERIOR COURT
Dated_____          By:_____
DEPUTY

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____was accepted by the defendant on the _____ day of _____, 20____.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 20___.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____was          accepted          by _____on behalf of said defendant on the _____ day of _____, 20____.

_____
CLERK, HAMILTON CIRCUIT/SUPERIOR COURT
Dated_____          By:_____
DEPUTY

Filed: 6/27/2024 7:50 PM
Clerk
Hamilton County, Indiana

| STATE OF INDIANA | ) | IN THE HAMILTON SUPERIOR COURT NO. 3 |
|---|---|---|
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO. 29D03-2406-PL-006763 |

| | |
|---|---|
| DACIAN MASTER FUND LP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JOSH WANDER, | ) |
| | ) |
| Defendant. | ) |

---

**VERIFIED PETITION**
**FOR TEMPORARY ADMISSION OF COUNSEL, FRANCIS J. EARLEY,**
**ON BEHALF OF PLAINTIFF DACIAN MASTER FUND LP**

---

Comes now Michael Red, in his capacity as counsel for Plaintiff Dacian Master Fund LP ("Plaintiff"), and pursuant to Disc. R. 3, and files this Verified Petition for Temporary Admission of Counsel, Francis J. Earley ("Affiant"), to serve as co-counsel for Plaintiff in this lawsuit. In support hereof, Affiant states as follows:

1.      On June 19, 2024, Plaintiff initiated this lawsuit by filing its Complaint in the Hamilton County Superior Court 3, Cause No. 29D03-2406-PL-006763.

2.      Good cause exists for Affiant's appearance in the Lawsuit because Affiant has a long-standing relationship with Plaintiff and its affiliates and Affiant routinely represents Plaintiff and its affiliates in complex commercial and business litigation matters.

3.      The undersigned counsel, Michael N. Red, Indiana Attorney No. 25066-53, has appeared and agreed to act as co-counsel.

4.      Affiant has made payment to the Executive Director of the Indiana Office of Admissions and Continuing Education a case specific registration fee of $300, accompanied by a copy of this Verified Petition for Temporary Admission pursuant to Rule 3(2)(a)(4) of the Indiana Rules of Admission and Discipline.

5.      Affiant is not a resident of the State of Indiana, regularly employed in the State of Indiana, or regularly engaged in business or professional activities in the State of Indiana

6.      Affiant is an attorney duly admitted to practice in the State of New York, Registration No. 2941680.  A certificate of Affiant's good standing issued on May 31, 2024, by the Appellate Division of the Supreme Court of the State of New York, Second Judicial Department, is attached hereto as Exhibit A.

7.      Affiant's current residential address is 15 Saxon Drive, Valhalla, New York and he is a member of the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 919 Third Ave., 38th Fl., New York, New York 10022, (212) 692-6230, FJEarley@mintz.com.

8.      Affiant has been licensed in New York since February 10, 1999.

9.      Affiant is currently a member in good standing in all jurisdictions listed above.

10.     Affiant has never been suspended, disbarred, or resigned as a result of a disciplinary charge, investigation or proceeding in any jurisdiction.

11.     No disciplinary proceeding is presently pending against Affiant in any jurisdiction.

12.     Affiant has not appeared by temporary admission in judicial or administrative proceedings in Indiana during the last five (5) years.

13.     Again, good cause exists for Affiant's appearance in the Lawsuit because Affiant has a long-standing relationship with Plaintiff and its affiliates and Affiant routinely represents Plaintiff and its affiliates in complex commercial and business litigation matters.

14.     Affiant has read and will be bound by the Indiana Rules of Professional Conduct and submits to the jurisdiction of the State of Indiana, the Indiana Supreme Court, and the Indiana Supreme Court Disciplinary Commission to resolve any disciplinary matter that might arise as a result of this proposed representation.

15.     Affiant has paid the registration fee to the Executive Director of the Indiana Office of Admissions and Continuing Education in compliance with subdivision Rule 3(a)(3) and a copy of the payment receipt and temporary admission attorney number issued by the Executive Director of the Indiana Office of Admissions and Continuing Education pursuant to subdivision is attached hereto as Exhibit B.

16.     Further Affiant sayeth not.

**I AFFIRM UNDER PENALTIES FOR PERJURY THAT THE FOREGOING IS TRUE.**

Francis J. Earley

Respectfully submitted,

RED LAW GROUP LLC


*/s/ Michael N. Red*
by Michael N. Red

*Attorneys for DACIAN MASTER FUND LP*

Michael N. Red
Attorney No. 25066-53
RED LAW GROUP LLC
P.O. Box 7848
Greenwood, IN 46142
(317) 908-9172
Red@rlgadvisers.com

## CERTIFICATE OF SERVICE

I certify that the foregoing has been served on all counsel or record via the court's electronic filing system and upon the following by First Class U.S. Mail, postage prepaid:

Josh Wander
1413 20th Street
Apt. 212
Miami Beach, FL 33139-1485


*/s/ Michael N. Red*
Michael N. Red

# **<u>EXHIBIT A</u>**



*Appellate Division of the Supreme Court*
*of the State of New York*
*Second Judicial Department*

———————

I, *Darrell M. Joseph*, Clerk of the Appellate Division of the Supreme Court of the State of New York, Second Judicial Department, do hereby certify that

### Francis J. Earley

*was duly licensed and admitted to practice as an Attorney and Counselor at Law in all the courts of this State on* **February 10, 1999**, *has duly taken and subscribed the oath of office prescribed by law, has been enrolled in the Roll of Attorneys and Counselors at Law on file in this office, is duly registered with the Office of Court Administration, and according to the records of this Court is currently in good standing as an Attorney and Counselor-at-Law.*



*In Witness Whereof, I have hereunto set my hand in the City of Brooklyn on May 31, 2024.*

*Clerk of the Court*

*CertID-00177067*



**Appellate Division**
**Supreme Court of the State of New York**
**Second Judicial Department**
45 Monroe Place
Brooklyn, N.Y. 11201
(718) 875-1300

HECTOR D. LASALLE
PRESIDING JUSTICE

DARRELL M. JOSEPH
CLERK OF THE COURT

KENNETH BAND
DEPUTY CLERKS

MELISSA KRAKOWSKI
WENDY STYNES
LAUREN G. DOME
BRIAN E. KENNEDY
ASSOCIATE DEPUTY CLERKS

To Whom It May Concern

An attorney admitted to practice by this Court may request a certificate of good standing, which is the only official document this Court issues certifying to an attorney's admission and good standing.

An attorney's registration status, date of admission and disciplinary history may be viewed through the attorney search feature on the website of the Unified Court System.

New York State does not register attorneys as active or inactive.

An attorney may request a disciplinary history letter from the Attorney Grievance Committee of the Second Judicial Department.

Bar examination history is available from the New York State Board of Law Examiners.

Instructions, forms and links are available on this Court's website.

Darrell M. Joseph
Clerk of the Court

Revised March 2024

# **EXHIBIT B**



# Office of Admissions & Continuing Education

Bradley Skolnik, Executive Director • 317-232-2552 • courts.in.gov

# Temporary Admission Receipt

## Francis J. Earley (9404-95-TA)

**Business Address:**  919 Third Ave.
38th Fl.
New York, New York  10022

**Phone:** (212) 692-6230

| Temporary Admission Case Information | | | |
|---|---|---|---|
| **Case Number** | **Start Date** | **Notice Return Date** | **Payment Date** |
| 29D03-2406-PL-006763 | 06/27/2024 | N/A* | 06/27/2024 |

\* Prior to January 1, 2022, Indiana Admission and Discipline Rule 3, Section 2 stated "all attorneys granted temporary admission...shall file a Notice...after a court grants permission to appear in the case or proceeding." As of January 1, 2022, the Notice is no longer filed with the Roll of Attorneys.

\*\* As of January 1, 2022, Indiana Admission and Discipline Rule 3, Section 2 requires attorneys requesting temporary admission to submit a case-specific registration fee.

FILED
Jun 28, 2024
CLERK OF THE HAMILTON
CIRCUIT COURT

STATE OF INDIANA      )     IN THE HAMILTON SUPERIOR COURT NO. 3
                            ) SS:
COUNTY OF HAMILTON   )     CAUSE NO. 29D03-2406-PL-006763

DACIAN MASTER FUND LP,      )
                                      )
           Plaintiff,            )
                                      )
    v.                                 )
                                      )
JOSH WANDER,                     )
                                      )
           Defendant.        )

---

### ORDER GRANTING VERIFIED PETITION
### FOR TEMPORARY ADMISSION OF COUNSEL, FRANCIS J. EARLEY,
### ON BEHALF OF PLAINTIFF DACIAN MASTER FUND LP

---

Michael N. Red of the law firm of Red Law Group, LLC, pursuant to Disc. R. 3, filed his Petition for the admission *pro hac vice* of Francis J. Earley in order that he may serve as co-counsel for Plaintiff Dacian Master Fund LP in these proceedings. This Court, having considered the Petition and being duly advised in the premises, now finds that the Petition is made for good cause and should be GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Francis J. Earley is granted admission *pro hac vice* for Plaintiff Dacian Master Fund LP in these proceedings and the attached Appearance is deemed accepted and filed.

Dated:     **6/28/2024**                                                      

                                           Judge, Hamilton Superior Court No. 3
                                                **Magistrate**

**<u>Distribution</u>:**

All counsel of record via the Indiana E-Filing System and to the following party via U.S. First-Class Mail, postage prepaid:

Josh Wander
1413 20th Street
Apt. 212
Miami Beach, FL 33139-1485

FILED
Jun 28, 2024
CLERK OF THE HAMILTON
CIRCUIT COURT

STATE OF INDIANA       )       IN THE HAMILTON SUPERIOR COURT NO. 3
                            ) SS:
COUNTY OF HAMILTON   )       CAUSE NO. 29D03-2406-PL-006763

DACIAN MASTER FUND LP,      )
                                 )
          Plaintiff,           )
                                 )
   v.                                )
                                 )
JOSH WANDER,                  )
                                 )
          Defendant.        )

## <u>APPEARANCE BY ATTORNEY IN CIVIL CASE</u>

Party Information: <u> X </u> Initiating   <u>   </u> Responding   <u>   </u> Intervening

1.   The undersigned attorney hereby enters his appearance on behalf of:

     **<u>Dacian Master Fund LP</u>**

2.   Name:     <u>Francis J. Earley</u>         Temp. Admission No.: <u>9404-95-TA </u>
     Firm:      <u>Mintz, Levin, Cohn, Ferris,</u>
             <u>Glovsky and Popeo, P.C.</u>
     Phone:    <u>(212) 692-6230</u>
     Address:  <u>919 Third Avenue, 38th Floor</u>
             <u>New York, NY 10022</u>
     E-mail:    <u>FJEarley@mintz.com</u>

3.   There are other party members: Yes ☐   No ☒   *(If yes, list on continuation page.)*

4.   *If first initiating party filing this case*, the Clerk is requested to assign this case the following Case Type under Administrative Rule 8(b)(3):  <u>n/a</u>

5.   This case involves support issues.  Yes  ☐ No ☒   *(If yes, supply social security numbers for all family members on continuation page.)*

6.   There are related cases: Yes ☐    No ☒   *(If yes, list on continuation page.)*

7.   This form has been served on all other parties. Certificate of Service is attached: Yes ☒     No ☐

8.   The undersigned attorney certifies that the contact information listed on the Indiana Supreme Court Roll of Attorneys is current and accurate as of the date the appearance is filed;

9. The undersigned attorney acknowledges that orders, opinions, and notices, and all documents served under Trial Rule 86(G) will be sent to him at the email addresses on the Roll of Attorneys regardless of other contact information supplied by the attorneys;

10. The undersigned attorney hereby acknowledges that he is solely responsible for keeping his Roll of Attorneys contact information accurate per Ind. Admis. Disc. R. 2(A)

11. Additional information required by local rule:  <u>None</u>

Respectfully submitted,

*/s/ Francis J. Earley*
Francis J. Earley

*Attorney's information shown above*

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing has been served on all counsel or record via the court's electronic filing system and upon the following by First Class U.S. Mail, postage prepaid this 28th day of June, 2024:

Josh Wander
1413 20th Street
Apt. 212
Miami Beach, FL 33139-1485

*/s/ Francis J. Earley*
Francis J. Earley

2

STATE OF INDIANA       )       IN THE HAMILTON SUPERIOR COURT NO. 3
                                 ) SS:
COUNTY OF HAMILTON     )       CAUSE NO. 29D03-2406-PL-006763

DACIAN MASTER FUND LP,     )
                                 )
          Plaintiff,           )
                                 )
      v.                            )
                                 )
JOSH WANDER,               )
                                 )
          Defendant.       )

---

**VERIFIED PETITION
FOR TEMPORARY ADMISSION OF COUNSEL, JOHN P. SEFICK,
ON BEHALF OF PLAINTIFF DACIAN MASTER FUND LP**

---

Comes now Michael Red, in his capacity as counsel for Plaintiff Dacian Master Fund LP ("Plaintiff"), and pursuant to Disc. R. 3, and files this Verified Petition for Temporary Admission of Counsel, John P. Sefick ("Affiant"), to serve as co-counsel for Plaintiff in this lawsuit. In support hereof, Affiant states as follows:

1.       On June 19, 2024, Plaintiff initiated this lawsuit by filing its Complaint in the Hamilton County Superior Court 3, Cause No. 29D03-2406-PL-006763.

2.       Good cause exists for Affiant's appearance in the Lawsuit because Affiant has a long-standing relationship with Plaintiff and its affiliates and Affiant routinely represents Plaintiff and its affiliates in complex commercial and business litigation matters.

3.       The undersigned counsel, Michael N. Red, Indiana Attorney No. 25066-53, has appeared and agreed to act as co-counsel.

4.       Affiant has made payment to the Executive Director of the Indiana Office of Admissions and Continuing Education a case specific registration fee of $300, accompanied by a

copy of this Verified Petition for Temporary Admission pursuant to Rule 3(2)(a)(4) of the Indiana Rules of Admission and Discipline.

5.     Affiant is not a resident of the State of Indiana, regularly employed in the State of Indiana, or regularly engaged in business or professional activities in the State of Indiana

6.     Affiant is an attorney duly admitted to practice in the State of New York, Registration No. 4919809.  A certificate of Affiant's good standing issued on June 25, 2024, by the Appellate Division of the Supreme Court of the State of New York, Second Judicial Department, is attached hereto as Exhibit A.

7.     Affiant's current residential address is 55 Murray Avenue, Port Washington, New York, and he is a member of the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 919 Third Ave., 38th Fl., New York, New York 10022, (212) 692-6230, JPSefick@mintz.com.

8.     Affiant has been licensed in New York since May 4, 2011.

9.     Affiant is currently a member in good standing in all jurisdictions listed above.

10.     Affiant has never been suspended, disbarred, or resigned as a result of a disciplinary charge, investigation or proceeding in any jurisdiction.

11.     No disciplinary proceeding is presently pending against Affiant in any jurisdiction.

12.     Affiant has not appeared by temporary admission in judicial or administrative proceedings in Indiana during the last five (5) years.

13.     Again, good cause exists for Affiant's appearance in the Lawsuit because Affiant has a long-standing relationship with Plaintiff and its affiliates and Affiant routinely represents Plaintiff and its affiliates in complex commercial and business litigation matters.

2

14.     Affiant has read and will be bound by the Indiana Rules of Professional Conduct and submits to the jurisdiction of the State of Indiana, the Indiana Supreme Court, and the Indiana Supreme Court Disciplinary Commission to resolve any disciplinary matter that might arise as a result of this proposed representation.

15.     Affiant has paid the registration fee to the Executive Director of the Indiana Office of Admissions and Continuing Education in compliance with subdivision Rule 3(a)(3) and a copy of the payment receipt and temporary admission attorney number issued by the Executive Director of the Indiana Office of Admissions and Continuing Education pursuant to subdivision is attached hereto as Exhibit B.

16.     Further Affiant sayeth not.

**I AFFIRM UNDER PENALTIES FOR PERJURY THAT THE FOREGOING IS TRUE.**

John P. Sefick

Respectfully submitted,

RED LAW GROUP LLC

*/s/ Michael N. Red*
by Michael N. Red

*Attorneys for DACIAN MASTER FUND LP*

Michael N. Red
Attorney No. 25066-53
RED LAW GROUP LLC
P.O. Box 7848
Greenwood, IN 46142
(317) 908-9172
Red@rlgadvisers.com

3

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing has been served on all counsel or record via the court's electronic filing system and upon the following by First Class U.S. Mail, postage prepaid:

> Josh Wander
> 1300 Monad Terrace
> PH B
> Miami Beach, FL 33139

> */s/ Michael N. Red*
> Michael N. Red

# **<u>EXHIBIT A</u>**



*Appellate Division of the Supreme Court*
*of the State of New York*
*First Judicial Department*

—————

I, Susanna M. Rojas, Clerk of the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, do hereby certify that

## John Sefick

*was duly licensed and admitted to practice as an Attorney and Counselor at Law in all the courts of this State on* **May 4, 2011,** *has duly taken and subscribed the oath of office prescribed by law, has been enrolled in the Roll of Attorneys and Counselors at Law on file in this office, is duly registered with the Office of Court Administration, and according to the records of this Court is currently in good standing as an Attorney and Counselor-at-Law.*



*In Witness Whereof, I have hereunto set my hand in the City of New York on June 25, 2024.*

*Clerk of the Court*

*CertID-00180438*

# Supreme Court of the State of New York
## Appellate Division, First Department

DIANNE T. RENWICK
PRESIDING JUSTICE

SUSANNA MOLINA ROJAS
CLERK OF THE COURT

MARGARET SOWAH
DEPUTY CLERK OF THE COURT

DOUGLAS C. SULLIVAN
DEPUTY CLERK OF THE COURT

To Whom It May Concern

An attorney admitted to practice by this Court may request a certificate of good standing, which is the only official document this Court issues certifying to an attorney's admission and good standing.

An attorney's registration status, date of admission and disciplinary history may be viewed through the attorney search feature on the website of the Unified Court System.

New York State does not register attorneys as active or inactive.

An attorney may request a disciplinary history letter from the Attorney Grievance Committee of the First Judicial Department.

Bar examination history is available from the New York State Board of Law Examiners.

Instructions, forms and links are available on this Court's website.

Susanna Rojas
Clerk of the Court

Revised October 2020

27 MADISON AVENUE    NEW YORK, NEW YORK 10010-2201
TEL.: (212) 340 0400    INTERNET: WWW.NYCOURTS.GOV/COURTS/AD1/

# **EXHIBIT B**



# Office of Admissions & Continuing Education

Bradley Skolnik, Executive Director • 317-232-2552 • courts.in.gov

# Temporary Admission Receipt

## John P. Sefick (9431-95-TA)

**Business Address:** 919 Third Ave.
38th Fl.
New York, New York  10022

**Phone:** (212) 692-6230

| Temporary Admission Case Information | | | |
|---|---|---|---|
| **Case Number** | **Start Date** | **Notice Return Date** | **Payment Date** |
| 29D03-2406-PL-006763 | 07/17/2024 | N/A* | 07/17/2024 |

\* Prior to January 1, 2022, Indiana Admission and Discipline Rule 3, Section 2 stated "all attorneys granted temporary admission...shall file a Notice...after a court grants permission to appear in the case or proceeding." As of January 1, 2022, the Notice is no longer filed with the Roll of Attorneys.

\*\* As of January 1, 2022, Indiana Admission and Discipline Rule 3, Section 2 requires attorneys requesting temporary admission to submit a case-specific registration fee.



# Office of Admissions & Continuing Education

Bradley Skolnik, Executive Director • 317-232-2552 • courts.in.gov

Important Information Regarding

Temporary Admission to Practice Law in Indiana

Attached is your receipt for your payment of the annual registration fee required for temporary admission to the Indiana bar pursuant to Indiana Admission and Discipline Rule 3, Section 2(a).

Place this number in the signature block of every document you file in an Indiana proceeding. However, **you must submit your Verified Petition for Temporary Admission to the Office of Admission and Continuing Education in <u>every</u> case in which you plan to petition to appear. You will receive a new receipt for each case**, and this new <u>receipt must be submitted to the court in which admission is sought with your Verified Petition. See Admission and Discipline Rule 3, Section 2(a)(3).</u>

Indiana's Admission & Discipline Rules can be found on line at <u>http://www.in.gov/judiciary/rules/</u>.

**Temporary Admission questions should be directed to the Roll of Attorneys Administrator at either 317-232-2552 or by email at rollatty@courts.IN.gov**

STATE OF INDIANA     )     IN THE HAMILTON SUPERIOR COURT NO. 3
                         ) SS:
COUNTY OF HAMILTON  )     CAUSE NO. 29D03-2406-PL-006763

DACIAN MASTER FUND LP,     )
                         )
       Plaintiff,     )               **FILED**
                         )            July 18, 2024
     v.          )     CLERK OF THE HAMILTON
                         )          CIRCUIT COURT
JOSH WANDER,     )
                         )
       Defendant.     )

## ORDER GRANTING VERIFIED PETITION
## FOR TEMPORARY ADMISSION OF COUNSEL, JOHN P. SEFICK,
## ON BEHALF OF PLAINTIFF DACIAN MASTER FUND LP

      Michael N. Red of the law firm of Red Law Group, LLC, pursuant to Disc. R. 3, filed his Petition for the admission *pro hac vice* of John P. Sefick in order that he may serve as co-counsel for Plaintiff Dacian Master Fund LP in these proceedings.  This Court, having considered the Petition and being duly advised in the premises, now finds that the Petition is made for good cause and should be GRANTED.

      IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that John P. Sefick is granted admission *pro hac vice* for Plaintiff Dacian Master Fund LP in these proceedings and the attached Appearance is deemed accepted and filed.

Dated:   **7/17/2024**  _____

                              Judge, Hamilton Superior Court No. 3
                                  **Magistrate**

**<u>Distribution</u>:**

All counsel of record via the Indiana E-Filing System and to the following party via U.S. First-Class Mail, postage prepaid:

Josh Wander
1300 Monad Terrace
PH B
Miami Beach, FL 33139

State of Indiana Hamilton Superior Court, #3

**DACIAN MASTER FUND LP**

Plaintiff/Petitioner

vs.

**Josh Wander**

Defendant/Respondent

Case No.:    **29D03-2406-PL-006763**

DECLARATION OF SERVICE OF
**Complaint; Summons**

Received by **Nancy Del Hierro**, on the **18th day of July, 2024 at 2:37 PM** to be served upon **Josh Wander** at **1413 20th St Apt 212, Miami Beach, Miami-Dade County, FL 33139**.
On the **22nd day of July, 2024 at 1:33 PM**, I, **Nancy Del Hierro**, SERVED **Josh Wander** at **1300 MONAD TER PH B, MIAMI BEACH, Miami-Dade County, FL 33139** in the manner indicated below:

[X]  **Mailing**
On the date of _07/22/2024_____, declarant then deposited in the United States mail, by First Class mail bearing the words "Personal & Confidential", in the county where the property is situated, the above listed documents with proper postage to:
**Josh Wander**
**1300 MONAD TER PH B**
**MIAMI BEACH, FL 33139**

**SUBSTITUTE SERVICE**, by personally leaving **1** copy(ies) of the above-listed documents at his/her usual place of abode with **alison wander**, who is 15 years of age or older, a person residing therein of who confirmed the Defendant resides at the above address and informed that person of the contents thereof.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY OF THIS PROCESS WAS LEFT IS AS FOLLOWS:
**I delivered the documents to alison wander who identified themselves as the subject's spouse, co-resident with identity confirmed by subject stating their name. The individual accepted service with security camera (documents left, seen by subject). The individual appeared to be a female contact.  Refused open door**

Service Fee Total: **$75.00**

I am over the age of eighteen, not a party to nor interested in the above entitled action, and have the proper authority in the jurisdiction in which this service was made. Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true and accurate.

NAME:  _____    07/22/2024_____
Nancy Del Hierro                                           Date



STATE OF INDIANA         )      IN THE HAMILTON SUPERIOR COURT NO. 3
                           ) SS:
COUNTY OF HAMILTON   )      CAUSE NO. 29D03-2406-PL-6763

DACIAN MASTER FUND LP,    )
                            )
           Plaintiff,     )
                            )
     v.                  )
                            )
JOSH WANDER,             )
                            )
           Defendant.    )

## E-FILING APPEARANCE BY ATTORNEYS IN CIVIL CASE

1.    The parties on whose behalf this form is being filed are:
Initiating _____     Responding   X      Intervening _____; and
the undersigned attorney and all attorneys listed on this form now appear in this case for
the following parties:  Josh Wander _____

2.    Attorney information for service as required by Trial Rule 5(B)(2)

Justin O. Sorrell           Atty. No.:   30866-49
Riley Bennett Egloff LLP     Phone:     317-636-8000
500 N. Meridian St., Suite 550  FAX:       317-636-8027
Indianapolis, IN 46204       E-Mail:    jsorrell@rbelaw.com

**IMPORTANT**:  Each attorney specified on this appearance:

(a)    certifies that the contact information listed for him/her on the Indiana Supreme
Court Roll of Attorneys is current and accurate as of the date of this Appearance;

(b)    **acknowledges that all orders, opinions, and notices from the court in this
matter that are served under Trial Rule 86(G) will be sent to the attorney at
the email address(es) specified by the attorney on the Roll of Attorneys
regardless of the contact information listed above for the attorney**; and

(c)    understands that he/she is solely responsible for keeping his/her Roll of Attorneys
contact information current and accurate, see Ind. Admis. Disc. R. 2(A).

Attorneys can review and update their Roll of Attorneys contact information on the Courts
Portal at http://portal.courts.in.gov.

3.    This is a PL case type as defined in administrative Rule 8(B)(3).

4.    This case involves child support issues. Yes _____No  X

5.      This case involves a protection from abuse order, a workplace violence restraining order, or a no – contact order.  Yes _____ No __X__

        This case involves a petition for involuntary commitment.  Yes _____ No ___X_____

6.      There are related cases: Yes _____ No __X_____ *(If yes, list on continuation page.)*

7.      Additional information required by local rule: _N/A_____

8.      There are other party members: Yes _____ No __X_____ *(If yes, list on continuation page.)*

9.      This form has been served on all other parties and Certificate of Service is attached: Yes ___X_____ No _____

                                        RILEY BENNETT EGLOFF LLP

                                        /s/ Justin O. Sorrell_____
                                        Justin O. Sorrell
                                        No. 30866-49
                                        Attorneys for Defendant,
                                        Josh Wander

RILEY BENNETT EGLOFF LLP
500 N. Meridian Street
Suite 550
Indianapolis, Indiana 46204
(317) 636-8000
jsorrell@rbelaw.com

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2024, I electronically filed the foregoing *E-Filing Appearance by Attorneys in Civil Case* using the Indiana E-Filing System.

I also certify that on August 12, 2024, the foregoing document was served via the Court's electronic filing system on the following:

Michael N. Red
Red Law Group LLC
red@rlgadvisers.com

I further certify that on August 12, 2024, the foregoing document was served via electronic mail on the following:

Francis J. Earley
John P. Sefick
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
FEarley@mintz.com
JPSefick@mintz.com

/s/ Justin O. Sorrell
Justin O. Sorrell

JOS/1329.000

4866-4490-9016, v. 1

STATE OF INDIANA        )      IN THE HAMILTON SUPERIOR COURT NO. 3
                       ) SS:
COUNTY OF HAMILTON    )      CAUSE NO. 29D03-2406-PL-6763

DACIAN MASTER FUND LP,      )
                              )
           Plaintiff,          )
                              )
      v.                      )
                              )
JOSH WANDER,              )
                              )
           Defendant.      )

## INITIAL MOTION FOR ENLARGEMENT OF TIME TO ANSWER COMPLAINT

Defendant, Josh Wander, by counsel, and pursuant to Indiana Trial Rule 6(B), moves the Court for an initial enlargement of time of thirty (30) days, through and including September 11, 2024, within which to answer or otherwise respond to Plaintiff's Complaint, and in support of said Motion, shows the Court the following:

1. Plaintiff filed its Complaint on June 19, 2024.

2. Defendant was served with the Complaint via process server on July 22, 2024.

3. Defendant's Answer to the Complaint is due on August 12, 2024, which deadline has not expired.

4. Despite due diligence and good faith, Defendant needs additional time to answer or otherwise respond to Plaintiff's Complaint.

5. This is the initial extension of time to answer or otherwise respond to Plaintiff's Complaint.

6. This Motion is made in good faith and not for purposes of delay.

WHEREFORE, Defendant, Josh Wander, requests an initial, thirty (30) day enlargement of time through and including September 11, 2024 within which to answer or otherwise respond to Plaintiff's Complaint, and for all other appropriate relief.

RILEY BENNETT EGLOFF LLP

/s/ Justin O. Sorrell
Justin O. Sorrell
No. 30866-49
Attorneys for Defendant,
Josh Wander

RILEY BENNETT EGLOFF LLP
500 N. Meridian Street
Suite 550
Indianapolis, Indiana 46204
(317) 636-8000
jsorrell@rbelaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2024, I electronically filed the foregoing *Initial Motion for Enlargement of Time to Answer Complaint* using the Indiana E-Filing System.

I also certify that on August 12, 2024, the foregoing document was served via the Court's electronic filing system on the following:

Michael N. Red
Red Law Group LLC
red@rlgadvisers.com

I further certify that on August 12, 2024, the foregoing document was served via electronic mail on the following:

Francis J. Earley
John P. Sefick
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
FEarley@mintz.com
JPSefick@mintz.com

/s/ Justin O. Sorrell
Justin O. Sorrell

JOS/1329.000

3

STATE OF INDIANA      )      IN THE HAMILTON SUPERIOR COURT NO. 3
                 ) SS:
COUNTY OF HAMILTON      )      CAUSE NO. 29D03-2406-PL-6763

DACIAN MASTER FUND LP,      )
                            )
          Plaintiff,      )
                            )
        v.      )
                            )
JOSH WANDER,      )
                            )
          Defendant.      )

**FILED**
August 13, 2024
CLERK OF THE HAMILTON
CIRCUIT COURT

## ORDER GRANTING
## INITIAL MOTION FOR ENLARGEMENT OF TIME TO ANSWER COMPLAINT

Defendant, Josh Wander, by counsel, and having moved the Court pursuant to Indiana Trial Rule 6(B) for an initial enlargement of time of thirty (30) days to answer or otherwise respond to Plaintiff's Complaint, and the Court being duly advised in the premises, hereby finds such Motion is meritorious and should be granted.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED, that Defendant, Josh Wander, has through and including September 11, 2024, to answer or otherwise respond to Plaintiff's Complaint.

Dated:    **8/13/2024**

                         Judge, Hamilton Superior Court No. 3
                                    **Magistrate**

Distribution:

Michael N. Red
Red Law Group LLC
red@rlgadvisers.com

Francis J. Earley
John P. Sefick
Mintz, Levin, Cohn, Ferris,
Glovsky and Popeo, P.C.
FEarley@mintz.com
JPSefick@mintz.com

Justin O. Sorrell
Riley Bennett Egloff LLP
jsorrell@rbelaw.com

JOS/1329.000